IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CINDY PIFER,

                Plaintiff,

        v.                           Civil Action No. 2:09-CV-63

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.


**REPORT AND RECOMMENDATION CLAIMANT'S MOTION FOR SUMMARY
JUDGMENT BE DENIED**

**I.  Introduction**

A.      Background

      Plaintiff, Cindy Pifer, (hereinafter "Claimant"), filed her Complaint on May 22, 2009,

seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on August

3, 2010.[2]  Claimant filed her Motion for Summary Judgment on September 2, 2010.[3]

Commissioner filed his Motion for Summary Judgment on November 1, 2010.[4]

B.      The Pleadings

      1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 27.

[3] Docket No. 31.

[4] Docket No. 35.

2.    <u>Defendant's Brief in Support of His Motion for Summary Judgment</u>.

C.    <u>Recommendation</u>

For the following reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because the ALJ properly evaluated the treating physician's reports and because the RFC determination is left solely for the ALJ.

2.    Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons.

## II. Facts

A.    <u>Procedural History</u>

Claimant filed her current application for Supplemental Security Income ("SSI") on April 28, 2004, alleging disability due to back, hiatal hernia, lung disease, bleeding ulcers, asthma, idemoptysis, allergic rhinitis, mild pulmonary hypertension, osteoporosis, allergy syndrome, bilateral hearing loss, arthritis, obstructive airway disease, thyroid/goiter, depression and anxiety with an alleged onset date of March 31, 2004. (Tr. 149, 151). The application was initially denied on January 31, 2006 and on February 9, 2006, Claimant requested review by the Appeals Council. (Tr. 94-106). On March 1, 2007, the Appeals Council issued an order vacating the hearing decision and remanding Claimant's case to an ALJ for further proceedings. (Tr. 109-112). The Appeals Council directed that, if necessary and available, the ALJ was to obtain evidence from a medical expert to help resolve the issue of whether Claimant needed daytime continuous oxygen use and, if such use is medically necessary, its impact on Claimant's ability to perform work-related functions. (<u>Id.</u>). Claimant received a hearing before an Administrative

Law Judge (hereinafter "ALJ") on May 15, 2007, in Morgantown, West Virginia. (Tr. 53). On June 29, 2007, the ALJ issued a decision partially favorable to Claimant. (Tr. 34). Claimant then requested review of this decision which was subsequently denied on July 17, 2008 by the Appeals Council. (Tr. 25, 32). Claimant filed this action, which proceeded as set forth above, having exhausted her administrative remedies.

B.    Personal History

Claimant was born on January 19, 1958 and was forty-six (46) years old on the onset date of the alleged disability and forty-nine (49) years old as of the date of the ALJ's partially favorable decision. (Tr. 172). Under the regulations, Claimant was considered a "younger person" aged 45-49, and generally, one whose age will not "seriously affect [Claimant's] ability to adjust to other work." 20 C.F.R. §§ 404.1563(c), 416.963(c). Claimant went to school until the ninth grade and completed her GED. (Tr. 817-18). Claimant has no prior work experience. (Tr. 183).

C.    Medical History

The following medical history is relevant to the issues of whether substantial evidence supports the ALJ's finding that the Claimant could perform a range of sedentary work as well as the ALJ's credibility determination relative to the Claimant:

**Medical Note, Healthworks Rehab & Fitness, April 4, 2003 (Tr. 293)**
4/14/03:
-Diagnosis: Lower back pain
-Rx: Patient need[s] lumbar back strengthening program. Please include pool and home program.

**Preston Rehabilitation & Orthopedic Physical Therapy, 4/14/03-7/17/03 (Tr. 294-305)**
4/14/03:
Diagnosis: Suspected intervertebral disc derangement with radiculitis, muscular weakness
Date of onset injury: 10/3/91
History: The pt reports in 1991 she was involved in a head-on collision and at that time had been

taken to the ER and had x-rays taken. Findings were only a knee contusion and head injury. She has seen Dr. Herto, a chiropractor , and continues to see him off and on since the accident. She has also seen different Mds off and on since 1991. She had had an MRI on 5/14/00 that did show a mild central disc bulge at L4-5 and L5-S1. She had followed through with PT some years ago, but is unable to give specific dates. Due to the continual chronic low back pain, when she saw (illegible), she was referred to Dr. Silverstein who recommended she follow through with PT for 6 weeks. At the end of the 6 weeks she is to contact Dr. Silverstein and potentially will be seeing a bone specialist. (Illegible).

**Subjective:** The pt reports that she is currently experiencing an 8/10 pain in her low back which does not get any better and she experiences an increase at its worst to a 10/10. Increased pain comes with prolonged walking activity, lying supine, and doing household chores. She notes that she has leg pain greater in the L than R, and does experience some LOB with stair negotiations. She reports no numbness within her LE. She notes stiffness in her L lower leg that makes her unable to walk at times. Upon arising in the am versus progressing through the day and into the pm, she finds the pain is continual. She does have difficultly with sleeping activities and was unable to have uninterrupted sleep time. She finds activities with the chiropractor wearing the back support brace and meds help to decrease that pain. She currently sees a chiropractor 1-2x monthly and will be seeing that chiropractor 1x this week potentially.

**Objective:** The is a 45 year-old obese female who demonstrates poor posture with an increased lordotic curve, forward head and rounded shoulders in a standing position. The pt is demonstrating 80 degrees forward flexion at the trunk and notes that the pain is going down throughout the low back and she feels a muscular pull. In extension she is able to achieve 40 degrees with discomfort at the LS junction. With side bending and rotation there is an increase in low back pain. The quality of movement demonstrated, is slow and painful for all planes of motion. There is the absence of trunk shift. Upon palpation of the iliac crest and PSIS there is the presentation of = levels. With standing march and forward flexion there is the presentation of symmetry. The pt does demonstrate a high increase in subcutaneous tissue that does potentially alter the findings and iliosacral motion will be assessed at a later date. The pt is able to heel and toe walk without difficulty. In supine, with a SLR passively there is + findings on the R with radicular S&S traveling into the foot. Active SLR R 53 degrees and L 59 degrees, passive SLR R 73 degrees and L 79 degrees. Slump test + on the L. Manual muscle testing as follows: Hip flexors L 4+/5 and R 4+/5 and R 4+/5, DR L 4+5 and R 5/5. Sensory levels are intact and normal. Reflex testing for quads L 2+ and R 2+, gastroc-soleus L 1+ and R 2+. With the demonstration of transfers from supine-to-sit the pt is performing this in an incrased and timely fashion and demonstrating discomfort within the back region. In a prone position, there is the findings of fair vertebral mobility and presentation of good lumbar ext. with prone press-up. Palpation is finding soreness within the lumbar and thoracic spinous processes. Sacral flex, and sacral ext. both increase pain within the low back. Prine press-ups with 10x reps increased the pain but do not present with radicular S&S. Double knee-to-chest with 10x reps does not present with radicular S&S. Both positions do increase tightness and heaviness noted by the pt.

**Assessment:** This pt presents with suspected intervertebral disc derangement with radicular symptoms on the L. Demonstrates muscular weakness throughout the LE with slightly diminished (L) Achilles reflex.

**Short Term Goals:** The pt to be instructed in a HEP in 1-3 visits, The pt to demonstrate 50%

decrease in pain at its worts with prolonged walking activities in 3-4 weeks.

**Long Term Goals:** 1) The pt to show improved hamstring flexbility in 5-6 weeks; 2) The pt to demonstrate a strength improvement to be = and symmetrical and at 4+/5 to 5/5 throughout the LE in 5-6 weeks; 3) The pt to have–findings with SLR and slump test on the L in 5-6 weeks; 4) The pt will report the ability to sleep throughout the night w/o pain in 5-6 weeks; 5) The pt to be able to perform household activities w/o difficulty and pain free within 5-6 weeks; 6) The pt to have a full return to functional and recreational activity w/o low back pain in 6-8 weeks.


4/18/03:
S: The pt notes that exercise program has helped to assist with her low back pain. She did experience numbness and tingling she reports with single knee-to-chest stretch.
O: The pt ambulates into the facility today utilizing her cane in hand but does not particularly utilize it to assist with gait. Therapeutic exercise, therapeutic activities, neuromuscular reeducation activities for pelvic awareness all initiated this date. Refer to sheet for specifics. Due to MRI findings of central disc herniation the program is geared towards flex. exercises. Concluded session with interferential E stim to the low back with MH application for 15 minutes.
A: The pt was w/o any radicular S&S in this session. With single knee-to-chest reps performed in clinic she was w/o radicular S&S. Her exercise program was progressed with post. Pelvic tilts with march, angry cat stretch, SLR, bridges.
P: Continue pt's plan of care per PT assessment 2x weekly.


4/22/03:
S: The pt is noting the absence of numbness and tingling within her LE since last session. She is having relief within the lower back and is able to address any low back pain with her HEP.
O: Therapeutic exercise, therapeutic activities, all per exercise flow sheet to promote strengthening and flexibility. Neuromuscular reeducation activity to promote improved pelvic awareness per exercise flow sheet. All progressions refer to sheet. Mechanical traction to the lumbar trunk for 15 minutes with a 90# static pull in a supine position with MH application.
A: Post traction and exercise program the pt is reporting the absence of all low back pain. She notes feeling the best that she has. She did not experience any radicular S&S through treatment.
P: Continue pt's plan of care per PT assessment 2x weekly.


4/24/03:
S: The pt. noting the absence of radicular symptoms since last session. She is reporting a decrease in low back pain but continues to have fluctuation.
O: Therapeutic exercise, therapeutic activities all per flow sheet with the absence of progression. Mechanical traction with MH for 15 minutes at 90# static pull to the lumbar region.
A: The pt is w/o low back pain and notes improvement post treatment session. She was reinstructed on the use of her HEP and how to utilize it to address her pain symptoms.
P: Continue pt's plan of care per PT assessment 2x weekly.


4/29/03:

5

S: The pt reports the absence of any radicular S&S since last session. She continues to note happiness with her progression and continued compliance with HEP.

O: Therapeutic exercise, therapeutic activities all per flow sheet. Progression of HEP with standing lumbar rotation, ab crunch, wall slides. Concluded session with mechanical traction of 95# static pull for 15 minutes with MH application in a supine position having hip and knees bent at approx. 90 degrees flex.

A: The pt notes all sessions w/o radicular S&S. Notes understanding of HEP progression. The pt showing steady improvements.

P: Continue pt's plan of care per PT assessment 2x weekly.

5/1/03:

Pt called and Cx, had other matters to handle today. Did not schedule for next week but did schedule for 5/12 and 5/15 at 1:00pm.

5/12/03:

Cx appt for today. Too many things going on at home. Forgot all about yesterdays appt. Schedule for Monday 5/19/03.

5/19/03:

Cx appt. for today. Too much to do. Scheduled for Friday, 5/23.

5/23/03:

Cx appt. for today due to "expecting" a call from her attorney about her house. I told her to call us when she had free time to schedule appt.

5/23/03:

S: The pt has continually cancelled appts and failed to reschedule over the past month. Contact had been attempted and finally made on this date. She notes that she has been too busy to come to therapy sessions. She reports that her back pain continues to fluctuate. She does note continuing with HEP which does help. She will be receiving a bone density test on 6/5/03. She was informed that consistency was necessary for PT in order to help effectively address back pain. The pt demonstrated understanding of this. She will call to reschedule.

5/29/03:

S: The pt called to cancel another appt this session. She was informed that she will be d/c if she fails to comply with next week's scheduled visits. She notes family situations have not allowed her to be consistent with treatments. Will continue plan of care per PT assessment if pt does not show for scheduled appts next week.

6/3/03:

S: The pt. notes that she has very minimal soreness within her back, but does continue to fluctuate with low back pain depending on her activity level.

O: Therapeutic exercise and activity per flow sheet with progression of this program, refer to sheet for specifics. Mechanical traction not performed secondary to pt being w/o pain or any

radicular S&S.

A: Program was progressed and HEP will be progressed next session if pt shows for scheduled appts. Modalities were not performed secondary to pt being w/o pain or radicular symptoms. She has had poor compliance with all program. It was reinforced the required need for consistency and compliance with scheduled appts. She is w/o pain post treatment session within her back region per her report. She was happy with the program progression and wanted to have HEP increased, but informed her that this will be increased with next session.

P: Continue pt's plan of care per PT assessment 1–2x weekly.


6/5/03:

Pt. Called and Cx due to schedule conflict. She wouldn't reschedule for Friday. Will be in next week.


6/12/03:

Diagnosis: Suspected intervertebral disc derangements, muscular weakness

S: Pt. Has been inconsistent and non-compliant. Pt (illegible) which she attributes to her (illegible) life. She now (illegible) to her HIP which she notes she is still using. Today, she is (illegible) but (illegible).

O: SLR"–" ®, Improves (L) hip Flexor strength, improved hamstring flexibility, improved forward trunk flexion by 10 degrees (illegible).

P: Can't Pt from 6/9/03 for 2x week for 4-5 weeks and then (illegible) to HEP. Will d/c in this duration of time if pt continues to Cx and not show for appts.


6/12/03:

S: After continual difficulty with compliance with PT the pt finally shows for a treatment session. She has yet to show consistency. Since April she has only been to PT approx. 6-7x. She notes today and increase in low back pain which she attributes to light activity.

O: Formal reevaluation performed today as follows: Trunk ROM 90 degrees, foward flexion w/o pain. The pt is displaying 20 degrees ext. with increased in irritation at the LS junction. SLR passively ® 88 degrees and (L) 80 degrees. LE strength as follows: Hip flex. (L)/® 4/5, knee flex and knee ext. 4+/5. Slump test-, SLR test -, Therapeutic exercise and therapeutic acitivites all per exercise flow sheet with progressions, refer to sheet for specifics. The pt's HEP was progressed with lat. Side step utilizing yellow Thera-Band.

A: Modalities were deferred this date secondary to pt being pain free and noting all exercise has helped abolish her pain. The pt has shown improvement with trunk flex. And is not having any complaints of pain. She has shown improved hanstring flexibility with passive SLR. Slight increase with strength for (L) hip flex. She is now showing the absence of radicular S&S with SLR and slump. Refer to formal reeval that was faxed to MD on all program information.

P: Continue pt's plan of care per PT assessment 2x weekly.


6/17/03:

S: The pt. notes the absence of all pain with HEP being the catalyst to eliminate pain if any is present.

O: Therapeutic exercise, therapeutic activities all per flow sheet without progression. Secondary

to pt being w/o pain modalities were deferred this treatment session.

A: The pt understanding and independent with her HEP with hip abd. And extension utilizing yellow Thera-Band. The pt continues to note the absence of pain within her back post treatment session. Continued reinforcement was made on the need to comply with PT.

P: Continue pt's plan of care per PT assessment 2x weekly.


6/19/03:

Cx appt for today, getting company, schedule two more visits.


6/23/03:

S: The pt is w/o any back pain and is feeling well. Continued compliance with HEP is what she attributes to her lack of pain.

O: Therapeutic exercise for strengthening and flexibility, therapeutic activities for light conditioning, neuromuscular reeducation activities for improved pelvic awareness. Program per flow sheet with progression, refer to this sheet for specifics. The pt continues to not require any modalities secondary to lack of any symptoms post treatment session.

A: Steady improvement being made with greater consistency of the absence of low back pain.

P: Continue pt's plan of care per PT assessment 2x weekly. If pt fails to maintain a level of compliance she will be d/c.


6/26/03:

S: Patient did experience an increase in low back pain after last session which she attributes to the leg press activity.

O: Therapeutic exercise and activity per flow sheet with slight progression, refer to sheet for program progression. After the completion of exercise program, patient was without any hip or low back pain and wanted to defer any modality treatment.

A: Patient seems to have appropriate success with exercise program to help alleviate her pain.

P: Continue plan of care as per PT assessment 2x weekly with discontinuing of any treatment if patient fails to be compliant with PT.


7/1/03:

S: The pt is w/o back pain or soreness this session.

O: Therapeutic exercise and activity all per flow sheet without program progression. Refer to sheet for specifics.

A: The pt is showing steady progress.

P: Continue pt's plan of care per PT assessment 2x weekly.


7/3/03:

S: The pt. notes compliance with set appts next week might be difficult secondary to family obligations that may arise. She is having no back pain or hip pain this session.

O: Therapeutic exercise, therapeutic activities, neuromuscular reeducation activity to promote pelvic awareness all per flow sheet with reinitiation of quad activities and UE and LE alternation. Modalities were once again deferred this session

A: The pt. was pain free post session. She continues to be happy with her progression

subjectively. Overall, the pt. shows a good tolerance to exercise program.
P: Continue pt's plan of care per PT assessment 2x weekly and to d/c if pt fails to be compliant.

7/7/03:
Pt cx-having problems with son–will call & reschedule.
7/17/03:
S: The pt continues to report a good level of progression and is w/o back pain. She wakes up stiff in the a.m. but gets better as the day progresses. She does have a minimal increase of low back pain and the HEP abolishes this.
O: Therapeutic exercise, therapeutic activities, neuromuscular reeducation activity all per flow sheet w/o any progressions. Formal d/c evaluation as follows: Hip flex, knee flexion, and DR(L)(R)4+/5, knee extension(L)® 5/5, SLR passive (L) 85 degrees and ® 90 degrees with signs for radicular S &S. The pt. demonstrates proper lifting techniques from knee to waist lifting approx. 10-20#.
A: The pt. is showing good improvements with hamstring flexibility and strength. There is the absence of any palpable soreness or pain. The pt. demonstrates good level of lifting techniques after instruction.
P: The pt will be d/c at this time.

**Dr. Timothy C. Miller, Preston Memorial Hospital, 9/22/03 (Tr. 306-310)**
Preoperative Status & Diagnosis:
This 45-year-old woman was referred to me because of chronic right upper pain which lasts all day long at times and sometimes all night. She reports having had these symptoms since age 12. This is associated with nausea but no vomiting. The pain is unaffected by any certain food. Ultrasound of the gallbladder on 8/19/03 showed gallstones.
I discussed the nature of the procedure and the nature of her symptoms in detail and indicated that her symptoms were somewhat atypical for gallstones, however, she clearly does have gallstones shown on her ultrasound. I offered her laparoscopy (illegible) but indicated that in view of the fact that her symptoms were somewhat atypical that I could not guarantee this would relieve her of all her complaints. I asked her to think it over and return to see me in a month's time which she did. She returned to my office actually about 2 weeks later and requested that we proceed with laparoscopic cholecystectomy.

Procedure:
The patient was taken to the operating room where general anesthesia was administered. The abdomen was prepped with Betadine and draped with sterile disposable drapes. A cut down into the peritoneal cavity was made and the Hasson introducer was placed in the infraumbilical location under direct vision and secured to the fascia with a pursestring suture. The abdomen was insufflated and the 10 millimeter introducer was placed in the epigastrium under direct vision as were two 5 millimeter introducers in the right side of the abdomen. Good exposure was obtained for laparoscopic cholecystectomy. I find that she does have moderate adhesions around the cystic duct and the anatomy here is somewhat kinked and there certainly is evidence of chronic inflammation in this area. Using careful technique, I was able to identify the cystic duct and stripped the peritoneum away from it. The cystic duct was completely circumferential dissected

out at its junction with the gallbladder and its junction with the common bile duct was appreciated but not extensively dissected. An operative cholangiogram was then done with two injections of the radiopaque dye through a catheter in the cystic duct and the cholangiogram showed it normal and expected biliary anatomy with prompt filling into the duodenum with no evidence of any retained stone or other difficulty. After reviewing the cholangiogram the cystic duct was divided between double silver clips and the gallbladder was dissected from the bed using the electrocautery technique. Hemostasis was good. The camera was then switched to the upper port and the gallbladder was extracted from the abdomen using the plastic bag device. The parts were removed under direct vision and checked for hemostasis at the entry sites and this was satisfactory. The fascia at the infraumbilical location was closed with 0-Vicryl and the wounds were otherwise closed with skin clips. After application of suitable dressings the patient was taken from the operating room in satisfactory condition.

Operative Diagnosis:

Cholelithiasis. Chronic cholecystitis.

Surgical Pathology Report:

-Specimen Received: gallbladder

-Final pathologic diagnosis: gallbladder, cholecystectomy: chronic cholecystitis and cholelithiasis.

-Gross description: The specimen is received in formalin labeled Cindy Pifer and anatomically designated "gallbladder." The specimen consists of a previously opened gallbladder measuring 8.2 x 2.5 x 2 cm. The serosal surface is smooth, gray-pink hemorrhagic. The specimen is opened and shows a solitary ovoid green calculus measuring 2 x 1.7 x 1.2 cm and is found impacted in the bile duct. The specimen measures 4 cm in opened circumference. The gallbladder wall ranges in thickness from .1 cm up to .2 cm. The mucosal surface is velvety, pink hemorrhagic and demonstrates diffused yellow streaking consistent with cholesterolosis. The cystic duct measures 1 cm in length.

**Stephen Herto, D.C., Every Body's Chiropractic Center, 12/27/00-11/26-03 (Tr. 311-313)**

Overall Medical Record

-Cindy Pifer has not been under care since November 26, 2003

12/27/00:

CC: 1) Neck/back; 2) R Hip

Past Traumas: Nerve pressure since MVA, irritation: sharp, nerves radiating: cramping/swelling hands/feet; Frequency: daily; 8/91-head on coll. ER hit head on windshield, injury R knee 18 years ago, difficult labor, constant HA since MVA

Review of other symptoms: hearing loss, vision, summer 200-hysterectomy for tumor, presc. Meds

Working Diagnosis: 723.1-Cervicalgea

**Examination:**

-C. Rotation: 60, 90; Lat. Flex: 10, (illegible); C. Flexion: 50; C. Extension: 40; L. Flexion: 80 H1; L. Extension: 10, Lat. Flex.: 10, 10; Rotation: 10, 10; Bilateral Scale: 91, 91.

**Records of Oximetry, Preston Memorial Hospital, 12/15/03-2/27/04 (Tr. 314-354)**

7/8/03:
Prescription–Cane for walking; Dx: Chronic Back Pain S/P MVA

12/15/03:
Interpretation:

    -Pre: moderate restriction

    -Post: Mile Restriction

    -Dilator: albuterol

    -Modifier: Not cleraly improved

    -Comments:

        *Spirometry (illegiible) ATS standards. It indicates a moderate restriction. There is no significant bronchodilator response. Recommend long volumes and diffusing capacity if clinically indicated.

1/22/04:
Time with saturations <90: 1.2 mins., .2%
Time with saturations <80: 0.0 mins., 0.0%
Time with saturations <70: 0.0 mins. .0%
Time with saturations <60: 0.0 mins. .0%
Time with saturations <88: 0.2 mins .0%
-A desaturation event was defined as a decrease of saturation by 4 or more.
-No events were excluded due to artifact.
-There were 28 desaturation events over 3 minutes duration.
-There were 69 desaturation events of less than 3 minutes duration during which:

    *The mean low was 91.1%; The mean high was 96.4%.

    *The number of these events that were:

| | | |
|---|---|---|
| -->0 & <10 seconds: 4 | -->0 seconds: 69 | |
| -->10 & <20 seconds: 16 | –>10 seconds: 64 | |
| -->20 & <30 seconds: 12 | –>20 seconds: 48 | |
| –>30 & <40 seconds: 5 | –>30 seconds: 36 | |
| –>40 & <50 seconds: 7 | –>40 seconds: 31 | |
| –>50 & <60 seconds: 2 | –>50 seconds: 24 | |
| –>60 seconds: 22 | –>60 seconds: 22 | |

    *The mean length of desaturation events that were >-10 seconds & <-3 mins was: 47.6 seconds

2/26/04:
Time with saturations <90: 4.7 mins. .7%
Time with saturations <80: 0.0 mins. .0%
Time with saturations <70: 0.0 mins. .0%
Time with saturations <60: 0.0 mins. .0%
Time with saturations <88: 0.6 mins .1%
-A desaturation event was defined as a decrease of saturation by 4 or more.

-No events were excluded due to artifact.
-There were 27 desaturation events over 3 minutes duration.
-There were 72 desaturation events of less than 3 minutes duration during which:
  *The mean low was 90.3%; The mean high was 95.7%.
  *The number of these events that were:

| | | | |
|---|---|---|---|
| >0 & <10 seconds: 4 | | >0 seconds: 72 | |
| -->10 & <20 seconds: 16 | | ->10 seconds: 68 | |
| -->20 & <30 seconds: 8 | | ->20 seconds: 52 | |
| ->30 & <40 seconds: 5 | | ->30 seconds: 44 | |
| ->40 & <50 seconds: 7 | | ->40 seconds: 39 | |
| ->50 & <60 seconds: 4 | | ->50 seconds: 32 | |
| ->60 seconds: | 28 | ->60 seconds: 28 | |

  *The mean length of desaturation events that were >-10 seconds & <-3 mins was: 57.1 seconds

2/27/04:
Sensor temperature: 22.4C/72.2F
Sensor temperature-Verification: 22.3C/72.2F
Volume measured as: 2.99L or 99.8%
Measured error is: -.2%
Average flow rate during CAL = 1.70L/S

2/27/04-Oxygen Orientation Checklist:
Equipment type: concentrator
General:
  -1 liter per minute for (illegible) hours per day.

5/10/04:
Prescription-See Dr. T. Miller non-healing R forearm lesion. R/o CA.

**Dr. Timothy C. Miller, Medical Records, 8/26/03-6/3/04 (Tr. 355-364)**
8/26/03:
CC: gallstones
Findings: weight 192; 45 y.o. with chronic ROQ pain which lasts all day long and all night since age 12. Nauses, no enesis, pain not affected by any certain food, anorexia, Wt=192. G4P4 often AM nausea, had vag hsyt 2000 at rubj. C/S GB 8/19/03-->gallstones
Diagnosis: cholelithiosis
Reccommendations: I emphasized that choleystectomy comes no guarantee of relief of symptoms. Her symptoms are atypical. She will think it over. Return 1 month.

9/12/03:
CC: still sick on stomach; light headed, pain across back, no (illegible)
Assessment: schedule choleystecty (illegible)
Plan: (illegible)

9/30/03:
CC: no complaints, no (illegible)

10/28/03
CC: stomach still hurts ins do epigastrum, c/o sore arm, swelling from IV; side still hurts in rt position; still hips hurt
Exam: extremities: (illegible) phlebitis, no inflammation, no pus
Assessment: no question
Plan: return (illegible)

5/13/04:
CC: non-healing R forearm lesion
Findings: 46 y.o. with 2 (illegible) round plaque (illegible), rt forearm, from a grease burn last summer. Some rough surface rusty (illegible) with (illegible).
Diagnosis: Neoplasm vs. dermatitis right (illegible)
Recommendations: biopsy done, return 1 week

5/14/04-Lab Report
-Final Diagnosis: skin, right arm, biopsy; chronic spongiotic dermatitis, lichen simplex chronicus, and benign ulcer.
-Comment: lichen simplex chronicus is a reactive hyperplastic change of hte skin caused by chronic external irritation such as rubbing or scratching. The dermatitis is nonspecific, consisting of a perivascular lymphocytic infiltrate. It is uncertain how this relates to the previous history of a burn in this location. There is no evidence of malignancy. Clinical correlation and follow-up recommended.
-Related Medical Data: Burn, right arm; 1-year status-post kitchen grease burn.
-Specimen: biopsy

5/20/04:
Cc: (illegible) (illegible) 2 wks.

6/3/04:
CC: Biopsy (illegible), (illegible), Lidex, (illegible)
Plan: (illegible)

**Dr. Russell Biundo, Rehab Disability Exam, 8/17/04 (Tr. 365-370)**
8/17/04:
CC: This is a female with COPD who was referred here for evaluation.
HPI:
      This is a nice woman who has a history of COPD probably from second hand smoke. She notes that she does not smoke. She notes that she has been using oxygen at night primarily and sometimes during the daytime. Patient notes that it is hard for her to work. She is not able to get around. She has never really been able to function very well. She denies any cyanosis, hemoptysis, respiratory distress. No actue bronchitis notes. She has

had no difficulty with hematuria. No evidence of anginal pain, cardiac dysfunction. No severe edema in the lower extremities. No tachypnea, dyspnea, orthopnea that is severe at this point. Patient notes that she has multiple problems.

Past medical history: GL ulcers, decreased hearing, COPD, hiatal hernia, osteoporosis.

Social history:

She is a mother and housewife.; has four children; does not use tobacco.

Review of Systems:

No edema and no lymphadenopathy. NO breast masses. No difficulty with gynecological disturbances. No GI symptoms. No genitourinary problems. No musculoskeletal dysfunction, pains or discomfort. The main problem is that she is weak. She is not able to do very well because of her lung problems. She has been evaluated by pulmonologist who reports the patient does have difficulties with bronchospasm with some reversibility noted with bronchodilators.

Physical Examination:

Nice woman who is pleasant and cooperative. She is moderately obese. Vital signs are normal. Cranial nerves within normal limits except she does have some decreased hearing. HEENT is unremarkable. Oropharynx is normal. Neck range of motion within normal limits. No lymphadenopathy or masses. No thyromegaly. No JVD. No stridor. Lungs have no crackles. Decreased breath sounds slightly. No rhonchi or rub. Heart has no S3 or S4. No murmur, rub or gallop. No thrill. Abdomen is soft, obese, nondistended. No masses. No edema or erythema. No cyanosis or clubbing. Range of motion within normal limits. Muscle strength is normal. Balance and coordination is normal. Speech and language within normal limits.

Assessment:

Pleasant woman who is status post difficulty with probably COPD, obesity, deconditioning.

Plan:

Ongoing program of rehabilitative intervention that she can do on her own. Wellness, weight loss, strengthening, cardiopulmonary conditioning primarily through a walker program little by little. Continue with the follow up with pulmonary. Continue with the bronchodilators and follow up and assessment by family doctor for causes of COPD in her case, which the patient feels it is probably due to second hand smoke of some type.

Range of Motion Form:

-Shoulder: normal
-Elbow: illegible
-Wrist: normal; hand can be fully extended, fist can be made, fingers can be opposed
-Knee: normal
-Hip: normal
-Ankle: normal
-Cervical spine: normal
-Lumbar spine: normal

Disability Evaluation Attachment:

Review of records: scharf-PA-C not 5/21/04, SOB, (illegible), (illegible), ulcer; COPD, SOB, 3/12/04-pt called & notified that she was vomiting blood x2 days, ordered VGI &

pelvic ultrasounds.
Use of assistive devices: quad care

**Physical Residual Functional Capacity Assessment, 9/3/04 (Tr. 371-379)**
Primary Diagnosis: Chronic back pain syndrome; Secondary: COPD
Exertional Limitations:
-Can occasionally lift and/or carry (including upward pulling) 50 pounds
-Can frequently lift and/or carry (including upward pulling) 25 pounds
-Can stand and/or walk (with normal breaks) for total of about 6 hours in an 8-hr
workday
-Can sit for a total of about 6 hours in an 8-hour workday
-Can push and/or pull unlimited, other than shown for lift and/or carry
Comments:
-The claimant's PFT's showed mild-moderate COPD. She uses oxygen at night,
complains of SOB in the morning. No respiratory distress. There are no musculoskeletal
dysfunction. She has full ROM and 5/5 strength. She uses a cane, but there is no
objective evidence that she needs it. She has a hx of hiatal hernia and bleeding ulcer and
underwent a laparoscopic cholescystectomy. Rx: prilosec for duodenol bulb ulcer.
Postural Limitations:
-None established
Manipulative Limitations:
-None established
Visual Limitations:
-None established
Communicative Limitations:
-None established
-C/O hearing loss, but she can hear conversational speech
Environmental Limitations:
-Avoid concentrated exposure to: extreme cold/heat, wetness, humidity, fumes, odors,
dusts, gases, poor ventilation, etc.
-Unlimited: Noise, vibration, hazards
Symptoms (Comments):
-Claimant is not credible. There is no objective evidence to support her statement that she
can barely function. She uses a cane, but has no musculoskeletal disfunctions and 5/5
strength in lower extremities. She does have chronic bronchitis and some reduction in her
breathing capacity, however, she does not need oxygen but wants it 24/7. Decrease RFC
to medium.
Comments:
There was an ALJ decision on 8/5/03-upheld by the Appeals Council on 3/31/04. I
contacted the Clmt, her lawyer for the prime case, the DO and the appeals council and
was unable to secure a copy. Of the ALJ letter.

**Dr. Joel Allen, Treatment Records + Psychiatric Evaluation, 8/17/04-10/28/04 (Tr. 380-399)**
8/17/04:

Depression

Intensity-Mild; Duration-Chronic, Symptoms-Agitation, Appetite Disturbance, Fatigue, insomnia, hopelessness; Other information-She reports of some crying episodes since her mother has passed away. She eats only one meal a day. Sleep 3-4 hours per night. She reports being under stress from her family.

Symptoms/Behaviors:

-Not Present: suicidal, homicidal, hostility, violent, self-neglect, self-injurious, oppositional behavior, impulsivitiy, poor judgment, bizarre behavior, hallucinations, delusions, paranoia, loose ass'ns, thought blocking, suspiciousness, concept disorganization, guilt, blunted affect, apathy, panic, phobic, manic, hyperactivity, distractibility, flat affect, inappropriate affect, loss of interest in activities, substance abuse, treatment motivation, potential relapse.

-Mild: withdrawal, tangential thinking, poor concentration, depression, anxiety, hopelessness & helplessness, agitation, high and/or low energy

-Moderate: Change in appetite, increased and/or decreased sleep

Education/Legal Status/Disability Gp/Presenting Problem

-Completed 9th grade education

-Not currently in school

-Consumer's disability group: mental health

-Primary presenting problem: mental illness

Drug & Alcohol Assessment

-No drug or alcohol problem reported

Social History

-Early Childhood Development: Claimant reports of growing up with both parents and they were married. She reports 3 brothers and one sister. The family has become torn apart due to the death of their month from 3 years ago.

-Current Psycho/Social Situation: She reports being married for 25 years and having 4 boys. She reports of being stressed out due to her family. She has been through many different surgeries related to her health.

-Abuse History: was abused by ex-husband for 3 years but has not been a victim of crime during the past year.

-Family History of Mental Illness: There is no history of mental illness, suicide attempts or substance abuse by parents, siblings (illegible).

-Education: Not currently in school, attained some high school, went to 9th grade.

-Current Occupational Assessment: Unemployed, never employed-she reports her husband would not let her work.

Medical History

-Height: 5'1"; Weight: 192 pounds

-Relevant Medical History: back/spine/limb condition, visual loss/impairment, asthma/emphysema/chronic bronchitis

Mental Status

-Within Normal Limits:

*Appearance, psychomotor activity, manner/attitude, speech quality/quantity

*Emotions: mood, affect, impulse control

*Thought Process: productivity, continuity, orientation, memory, attention/concentration, judgment/reason, insight
*Thought Content: preoccupations, perceptions, delusions
*Somatic: weight, energy/libido
-Sleep:
*Initial Insomnia
*Sleeps 3-4 hours. Only eats one meal a day (appetite fair).
Adult MH/SA Functional Assessment Instrument (FAI)
-Domain I Self Care
*No Dysfunction
-Domain II Activities of Community Living
*Needs some physical help or assistance:
-Performing household chores, taking care of own possessions, taking care of own living space, preparing or obtaining meals
*Needs substantial help:
-handling personal finances
*Acts independently; self sufficient:
-Shopping for food, clothing, personal needs, treating minor physical problems,
*Needs verbal advice or guidance:
-traveling from residence to required destinations, accessing and using available transportation, accessing and using community services, obtaining assistance in an emergency
-Severity Rating: Mild Dysfunction
-Domain III Social Interpersonal & Family
*Somewhat typical behavior
-communicating clearly
*Always typical behavior
-asking for help when needed, forming and maintaining a social network, engaging in social and/or family activities, effectively manage child care responsibilities and/or other family or interpersonal obligations, effectively handle conflict with others, asserting self effectively and appropriately
*Generally Typical behavior
-responding to other's initiation of social contact
*Severity rating: mild dysfunction
-Domain IV Concentration and Task Performance
*Generally Typical Behavior
-able to remember locations and procedures, able to understand and remember instructions, able to maintain attention and concentration spans, able to perform activities within a schedule, maintain regular attendance and be punctual, able to perform in coordination with or in proximity to others without being distracted by them
*Always Typical Behavior

-able to sustain an ordinary routine without special supervision, able to complete simple tasks without errors, able to complete simple tasks without assistance

      *Somewhat Typical Behavior

-able to perform at a consistent pace without an unreasonable number and/or length of rest periods, able to handle small changes without undo upset

      *Severity Rating: Mild Dysfunction

-Domain V: Maladaptive, Dangerous & Impulsive Behaviors

      *Characterizes health as poor

      *Physical health limits Claimant a lot, accomplishes less than Claimant would like

      *Hasn't felt calm and peaceful within the last 30 days, did not have a lot of energy within the last 30 days and felt downhearted and blue all the time within the last 30 days

-Functional Status/Treatment Plan

    -No history of Functional Deficit/Not applicable:

      *School, activity of daily living, maintain relationships, self administer medications, maintain personal safety

    -With direct assistance:

      *accessing other services

-Risk Assessment

    -Suicidality: denies having suicidal thoughts, no known suicide attempts

    -Threats of Violence: no threat of violence, no history of being violent towards others

-Validity of Assessment:

    *Not certain if symptoms are true!


8/26/04-Psychiatric Evaluation:

Identification:

Claimant is a 47-year-old white female who comes in with a three-pronged cane. She states that, "A lot of things are getting me agitated." She states she got nervous approximately three years ago. A number of things occurred at that time. Her son, who had been adopted by her mother, and is now twenty-five years old, came to live with her after being at New Hope, South Carolina for treatment. He argues with her he continues to live with her and her husband. She states that he stays up late. She can't go to sleep until he has gone to bed and is asleep. She argues with him and he argues back. They do not get along and it would help a great deal if he were not in the home, but she does not have the seventy dollars to pay for the paperwork to be processed that is required to get him to become a ward of the state.

She states that her mother died about three years ago. She continues to miss her. She feels that part of the reason she has difficulty sleeping is because she is sleeping in her mother's room of the house and has not resolved this issue. She denies ever having depression prior to three years ago when this started. She does not describe decreased energy. She does not describe decreased self-esteem but describes increased irritability

and agitation and frustration. She occasionally will cry. She denies suicidal ideation. She denies restriction of interests, however, she does admit to reclusiveness. She states she does not like to go into stores. She has never liked crowded places. She has her husband do the shopping, but he can't manage the food card, so she goes in to do that. She states that he can read and write but he doesn't manage that card particularly well. The reason she does not go into stores is because, "people watch you." She feels she is disabled because of hearing loss, her emphysema and her GI problems.

She has to use oxygen at night.

Mental Status Examination:

-Examination reveals an alert, cooperative woman who spoke coherently and well and had good eye contact. Her facies were somewhat flat. Her affect was somewhat blunted. She denied any of the attributes of psychotic processes and I agree with that. She claims she is depressed, but this is an atypical depression. We will call it Depression NOS, single episode.

Plan:

She will start on Wellbutrin and return to see me in approximately 1 month.

Diagnostic Impression:

-Axis I: Depression, NOS, single episode
-Axis II: None
-Axis III: Emphysema
-Axis IV: Economic
-Axis V: GAF = 60


9/9/04:

Physician's Diagnosis:

-Axis I: Depression NOS
-Adaptive Functioning: 55

Medical Notes:

-Was not able to tolerate the (illegible). She vomited it back up and did not try again. She is unchanged. She has good eye contact. She sleeps poorly. She denies SI. She is worried about her (illegible). Plan: return in 2 weeks, - SI, HI, -psychosis.

9/23/04:

Physician's Diagnosis:

-Axis I: Depression NOS

Medical Notes:

-Still having trouble and (illegible) but she is able to sleep at a normal time anyway. She is chilly and stays active and (illegible) the limitation set by her back and hip. She has good eye contact. Denies SI and is sleeping better. Return 5 weeks.

10/28/04:

Physician Diagnosis:

-Axis I: Depression NOS

-Axis III: Emphysema
-Axis IV: Psychological Impairment: Eco

Medical Notes:
    -States she is doing ok. She is angry at her brother about trying to get her out of the house. She does not feel depressed. She is (illegible). She has good eye contact, speaks continually & well. + psychosis, -SI, or HI
    -Plan: continue meds, return 2 months.

**Medical Records, Physician Office Center, 11/1/04 (Tr. 400-404)**

11/1/04:

Dr. Wetmore medically evaluated Claimant's hearing loss and Claimant may be considered a candidate for a hearing aid.

**Dr. Carla J. Scharf, Medical Records, 6/16/03-11/10/04 (Tr. 405-424)**

6/16/03:

History:
    -Patient is seen for baseline dexa bone densitometry scan, and has a strong family history of osteoporosis. Patient is 45 years old, weighs 190 lbs. And is 5'01" tall. Patient is post-menopausal.

Dexa Bone Mineral Density Results:
    -Scan site T-score z-score BMD (g/cm2)
    -AP Spine-1.7-1.2 0.860
    -Lateral Spine
    -Hip Lt. Total-1.6-1.3 0.743
    -Hip Lt. Femoral Neck -2.2-1.7 0.610
    -Hip Rt Total-1.3-1.0 0.779
    -Hip Rt. Femoral Neck-1.1-0.7 0.726
    -Forearm: N/A
    -Forearm: N/A

Impression:
    -Osteopenia; The patient's body habitus may preclude accurate assessment of BMD on the lateral view.

Recommendations:
    -F/u BMD in 1-2 years to evaluate treatment

7/1/03:

Dexa Scan shows osteopenia-will start pt on (illegible) weekly 70 mg/wk #415 RF called to Cornerstone, will check Dexa year.

7/8/03:

S: Pt. Comes in today following up her bone density scan. She states that she took one of the Fosamax and she took it in the morning and that evening when she laid down, she got sick at her stomach, dizzy and threw up. She would like to change medicines if possible.

O: Neck is supple w/out mass. No carotid bruits; lungs are clear; heart RRR; back is non-tender

at this point; straight leg raises neg. DTR's are 2+ and equal bil

A: 1) Chronic back pain. S/P MVA, years ago

P: will d/c the Fosmax and try Actonel 35 mg weekly same directions and she's to call me if she has any problems. I did write her an Rx for a cane with a dx of chronic back pain. The cane that she has wa her father's and PT tells her that it too tall for her and she needs fitted for one herself. So I did write that. She'll f/up in 3 months, sooner if any problems.

7/21/03:

Evista 60mg #30 samples given per CS order (illegible), Actonel making pt. sick she reported on 7/21/03

7/28/03:

Claimant called re: Evista (for bones) doing better

Advice: noted

8/19/03:

Abdominal Ultrasound:

    -Abdominal ultrasounds is compromised due to the patient's body habitus. The gallbladder shows multiple gallstones. The right kidney is unremarkable measuring 11.4-cm. The left kidney measures 11-cm. No hydronephrosis. The spleen is grossly unremarkable. The midline structures are obscured.

Impression:

    -1. Large gallstones

9/11/03:

S: Pt. Comes in today for her 4 month RA. She states that things are just about the same. Her back hurt her just as much as it always has and she's still filing for disability and she's denied. She's either re-applying or appealing this. She states she has not had her gall bladder surgery yet. She goes tomorrow for hte appt. and they have stopped her chiropractor appts until after she has surgery. She'd like a refill of the sinus medicine which I believe is Allegra but we'll probably need to change that to Clarinex because of the Medicaid.

O: Neck is supple w/o mass. No carotid bruits; lungs are clear; heart RRR; back pt states is tender from her T-spine down to her LS spine and she also states that the paraspinal muscles from her shoulders down to her lumbar area is also tender although there's no spasm and w/o me asking I would have not known if that area was tender or not. ALR's negative. DTR's are 2+ and equal bil.

A: 1) Chronic back pain; S/P MVA; 2) Depression; 3) Allergies

P: Pt will have Clarinex 5 mg #30 one a day and 3 RF called to Cornerstone Pharm. She'll cont. her other medicines as directed. She'll see the surgeon tomorrow and have her gall bladder taken out as scheduled. She'll return in one month. She needs her pap and labs done so we'll do that in about a month, that should give her time to re-cooperate. We'll f/u from there.

9/29/03:

Claimant called re: had surgery mon. am for gallbladder & stones, went home Tuesday

Advice: noted

10/7/03:
S: pt. Comes in today for her annual pap and pelvic. She states she's been doing pretty well. She had her gall bladder surgery done the end of Sept and is doing good.
O: Neck is supple w/o mass; lungs are clear; heart RRR; breasts are symmetrical w/o mass; abd is soft and non tender; She does have 3 surgical scars which are healing quite well. External genitalia is a normal female; vaginal area is clear; no adnexal mass or tenderness; rectal no masses and stool is heme negative.
A: 1) normal annual exam; 2) hyperlipidemia; 3) possible exposure to Hep C.
P: Pt. Would like to be checked for Hep C because her mother's boyfriend has it and they're over there quite a bit. I told her it was only through blood borne products that it would be transmitted but she states she wants to be sure. So, we'll do a Hep C antibody, hepatic lipid and basic metabolic on her. We'll schedule screening mammogram. I'll call her with the results.

11/7/03:
Claimant called re: x-ray results, wanting mamogram report from 11/4/03
Advice: We don't have them, will call with results when they arrive

11/9/03:
Observation:
        -Bilateral Mammogram:
                *There are no prior studies available for comparison. The overall breast architecture demonstrates scattered fibroglandular tissue. There is no evidence of any masses, suspicious clustered microcalcifications or architectural distortion.
Impression:
        1. No mammographic evidence for malignancy. Routine follow-up examination is recommended in one year. Level I: negative

11/24/03:
Claimant called because he voice has been coming and going for the last month now. What can she do?
Advice: Refer to Dr. Whitmore ENT for evaluation, late am or early afternoon appt. bets for laryngitis x 1 month

12/8/03:
Needs appoint. for inhaler

12/10/03:
S: Pt comes in today c/o SOB. She states she's noticed it over the last couple of months but it's just gotten worse. Its to the point now when she lays down she feels SOB but she's not sure if she has a lot of reflux, hiatal hernia bothering her a lot of things are going on. She states she feels like she has to get up at night to breathe better. She also states that if she walks short distance she feels SOB.

O: Neck is supple w/o mass; lungs are clear, heart RRR; abd is soft with tenderness in the epigastric area and bil lower rib areas; ankles are w/o edema.

A: 1) SOB; 2) GERD; 3) Hiatal Hernia; 4) Rib pain.

P: Pt is to have a rib series, CXR today. I did give her an Albuterol inhaler 1-2 puffs qid prn. I told her if the x-ray was clear and she did not have CHF that we'd do PFT's and go from there. Advised her in regards to the hiatal hernia and GERD s/s to take the Aciphex in the evening, elevate the head of her bed, don't eat anything after 5 or 6 o'clock and to use Maalox or Mylanta during the day and then when we call her with the results we can schedule f/u after that.

12/17/03:

Pt. Mild/med. Restriction (illegible) PFT at Preston Memorial. Will try Advair 100/50 & inhalation BID 2 RFCornerstone Pharm; follow up in month.


1/15/04

S: Pt comes in today for a pre-op physical and one month return appt. She states that her breathing is better except for first thing in the morning. She's on the Albuterold qid and on hte Advair bid. She states that when she gets up about 4 or 5, she'll wake up SOB. She uses both inhalers at the same time, she gets a little bit dizzy but otherwise everything else is stable. She's going in she believes on the 9th of Feb. For a total full denial extraction at WVU. She has had two surgeries prior to this. Hysterectomy and a gallbladder surgery and did not have any problems with the anesthesia at all.

O: Tm's are within normal limits; throat is clear; neck is supple w/o mass; no carotid bruits; lungs are clear; heart RRR; abd is soft and non-tender; no masses palpated; extremities are w/o edema

A: 1) mild-moderate COPD, stable; 2) Arthritis, stable; 3) GERD, stable

P: Pt. Is to have EKG, CXR, basic metabolic, CBC and PT PTT today. We will fax all of these when we get them back to Morgantown. Because of the early morning SOB, I have set it up for Lincare to come in for overnight pulse oximetry for evaluation and we'll follow that up in a month. I also added Singulair 10 mg one in evening for her. We'll see how that goes. We'll see her back in a month, sooner if any problems.


1/20/04

Claimant called wanting another respiratory test @ PMA

Advice: Lincare needed resulst of pulse ox overnight, trying to get ahold of pt to schedule it


1/21/04:

Observation:

    -Chest, 2 views: Cardia silhouette is within normal limits. Hilar and mediastinal structures are also unremarkable. Both lungs are well expanded showing no acute parenchymal process. No evidence of pleural collection is seen. Bony thorax is also unremarkable.

Impression:

    -1. Normal Chest


2/2/04

Claimant called re: last weeks x-ray results.
Advice: Advised pt. no reports today.

2/17/04:
S: Pt comes in today 1 month return appt. She states that she's been doing fairly well. She can tell a difference with the inhalers. She states that she's not quite as SOB but she's still somewhat SOB in the mornings. She really thinks that she does need O2 although all testing done so far have been negative. She hasn't gotten her teeth pulled yet. She states that because of bad weather she was unable to get there. She's still worried about the ovarian cyst that she has that comes and goes.  I told her that she's on the Evista and she should not be taking any hormone replacement therapy with that. She may have to have a laproscopic procedure done.
O: Neck is supple w/o mass. Lungs are clear, Heart RRR.
A: 1) f/u COPD, improved
P: We will check the pt's ABG's. She'll have this done at Preston and then we'll f/u with her in 3 months, sooner if these are abnormal. I told her that we would just have to wait and see. I told her that was a good sign that her breathing was not as bad that these tests were all normal and that her inhalers are helping her.

2/25/04:
Claimant called re: fax order to Kingwood hospital for oxygen test alone at home. Said you would know because she had it before.
Advice: pt requests repeat overnight pulse oximetry; still short of breath

3/12/04:
Claimant called re: throwing up blood x2 days; wants (illegible).
Advice: (illegible) (illegible), pelvic ultrasound at Preston, no ovarian cysts (illegible)

3/18/04:
Upper G.I. Series
	-There is esophagical reflux. On one view only there is a suggestion of an ulceration at the EG junction. The stomach, duodenal bulb and C-loop are normal. Duodenum diverticulum is incidentally noted.
Impression:
	1. Ulceration seen in one view only at the EG junction, a mass/tumor/Barrett's esophagus could give this appearance. Direct visualization of this area may be necessary. Clinical correlation is required.
	2. Esophageal reflux.
	3. Large hiatal hernia
	4. Duodenal bulb ulcer

3/22/04:
Sonogram Pelvis:
	-Sonogram of the pelvis transabdominally shows that the uterus is surgically absent. The ovaries appear normal. The right ovary is no greater than 3.3 cm. The left ovary no greater than

1.5 cm.

Impression:

-negative study for significant abnormalities. There has been a prior hysterectomy.

3/25/04:

UGI shows duodenol bulb ulcer, treat w/ Prilosex OTC (illegible) day #30/3RF to Cornerstone in Kingwood. Follow up 1-2 weeks if no improvement (illegible).

5/21/04:

S: Pt. Comes in today for her f/u. She states she wants me to call Lincare because she gets SOB during the day. She states that a fellow named George from Lincare tested her and said she might be able to get a portable O2 for the day time. The last I knew she only qualified for night time O2 use and that was barely. She states that everything else is the same. She has een denied her disability once again.

O: Lungs are clear; heart RRR, neck is supple w/o mass. No carotid bruits, abd is soft, obese, non tender, Pt's gait is the same. She can move from table to chair w/o difficulty although she does so slowly and deliberately. She is still walking with a cane.

A: 1) SOB; 2) Dyspnea; 3) Arthritis

P: Pt. Will cont. present meds. I refilled her Advair 100/50 mg one inhalation bid with refills, Evista 60 mg #30 one a day and 3 RF. Her Priolsex OTC 20 mg one a day with 3 RF. She'll f/u in 3 months, sooner if any problems. She did bring us a copy of the pathology report. She saw Dr. Hoffman and he did a biopsy of her (R) forearm. She had a chronic irritation since a grease burn a year ago and it just shows some chronic spongiotic dermatitis lichen simplex chronicus and benign ulcer.

9/2/04-Disability Determination Section:

Person contacted:

-Carla Scharf MD

Subject:

-The medical records do not make it clear about Claimant's need for a cane. Dr. Scharf says that she does not need one. She carries it most of the time, she has a normal gait. Her breathing is not getting any worse. She ust barely qualified for nighttime oxygen (by 1 percent) but she wants to be on oxygen all the time, and calls frequently asking for daytime oxygen.

9/24/04

S: Pt. Comes in today for her routine appt. She states she is doing well other than she would like to have O2 to carry around with her just in case she was out and didn't get back to the house. She wants portable O2 during the day and I tried to explain to her that she did not qualify for O2 during the day that she only qualified for it at night and she's wondering if she is out and about and does not get home at night that she would need a tank with her just in case. She states that her back still hurts, knees still hurt. She's been denied for disability again but she states she will not give up and she will try for disability again. She states that the doctor she saw from Morgantown told her that she was 100% disabled but then from the report they sent social security, said she was not disabled.

O: Neck is supple w/o mass. No carotida bruits. Lungs are clear, Heart RRR. Abd is soft and non-tender, Obses, Pt's back has tenderness in the SI joints bil. Knees there is no swelling, She has full ROM. Straight leg raises negative. DTR's 2+ and equal bil. No edema of the ankles
A: 1) Back pain; 2) leg pain; 3) knee pain; 4) COPD
P: Pt is to have a basic, lipids today. I will call her with results. I told her I would call Lincare about the O2 but I do not think Medicaid would pay for it because she doesn't qualify with her levels but I will call and call her back. She will return in 4 months sooner if any problems.

9/22/04:
-Called pt re: labs and advised her that her insurance would not pay for additional O2 tank-portable when she only meets criteria for overnight O2.

10/19/04:
S: Pt comes in today for her annual exam. She states she's been doing pretty well. She would like to have her flu shot today.
O: Neck is supple w/o mass, lungs are clear, heart RRR, breasts are symmetrical w/o mass. Pt does do self-breast exams, abd is soft and non-tender, external genitalia is a normal female, vaginal area is clear, cervix and uterus are absent, no adnexal mass or tenderness
A: 1) normal annual exam
P: Pt. Was advised, will schedule screening mammogram and give her flu shot today. She'll keep her regular appt in January, sooner if any problems.

11/1/04:
Pt. Called and has been throwing up blood for 2 days. Left message pt. needs to go to ER.

**Psychiatric Review Technique Form, 12/23/04 (Tr. 425-439)**
4/30/04
-Medical Disposition: Impairment not severe
-Categories upon which the medical disposition is based: 12.04 affective disorders
-A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above. Disorder: Depression, NOS
-Rating of Functional Limitations:
    1. Restriction of Activities of Daily Living: mild
    2. Difficulties in maintaining social functioning: mild
    3. Difficulties in maintaining concentration, persistence, or pace: mild
    4. Episodes of decompensation, each of extended duration: none
    -Evidence does not establish the presence of the "C" criteria
-Consultant's notes:
    -Age: 46 F, 9th gr. No work
    -Alleg: Depression
    -08/04: Valley Heath for eval
        *I: Depression NOS, single episode
        *II: None

*Mild decrease in all (illegible)

*Mild difficulty w/concentration

-10/28/04: doing ok

-Recon: no initial P review, Claimant did not allege problems on initial

-3rd party: forgetful, doesn't follow instruction well. Doesn't get along with others well. (Illegible) to physical factors) ADL-consistent with 3rd party; Claimant's (illegible) for functioning, Sxs & Tx are consistent with MER and other evidence in file from testing and 3rd party services (illegible) credible.


## Ventilatory Function Report Form & Best Pre-Med Summary Test Results, 12/28/04 (Tr. 440-443)

Examination report:

-No evidence of bronchospasm or acute respiratory illness

-Gave good effort

Interpretation:

-mild restrictive disease

X-ray report:

-Chest: The soft tissues and rib cage are normal; the costophrenic sinuses are well delineated, the lung fields are clear, the hila are normal, the heart measures 12.5cm in a chest cage of 26 cms. The aorta is normal

Impression:

-Normal chest

## Residual Functional Capacity Assessment-Physical, 1/20/05 (Tr. 444-452)

Current evaluation-primary diagnosis: back pain syndrome

Exertional limitations:

-can occasionally lift and/or carry 50 pounds

-can frequently lift and/or carry 25 pounds

-can stand and/or walk (with normal breaks) for a total of about 6 hrs in an 8-hr workday

-can sit (with normal breaks) for a total of about 6 hrs in an 8 hr workday

-Explanation: alleg: back pain, hernia, lung olz, bleeding ulcer; 9/04: initial review (medium); 8/04: phys. CI-orthopedist-didn't evaluate lung problems, 5/5 sttrength, normal gait, illegible WNL; 12/04: FEV 1.60 post BD; 11/04: audiology exam - chest x-ray

Postural Limitations:

-None established

Manipulative Limitations:

-None established

Visual Limitations:

-None established

Communicative Limitations:

-None established

Environmental Limitations:

-Unlimited: extreme cold and heat, wetness, humidity, noise, vibration, hazards

-Avoid concentrated exposure: fumes, odors, dusts, gases, poor ventilation, etc.

Treating or Examining Source Statements:
>-Claimant is partially credible. She does have some lung problems. She had decreased breath sounds at the initial CE. PFS in December shows some restriction. Her physical exam otherwise is essentially unremarkable. Pain and fatigue considered but not to the limiting effects alleged.

**Hospital Records, Preston Memorial Hospital, 7/21/05-8/10/05 (Tr. 453-458)**

7/21/05:

DXA Bone Densitometry Report
>-Assessment: The BMD measured at Femur Neck Left is .734 g/cm with a T-score of -2.0. This patient is considered osteopenic according to World Health Organization (WHO) criteria. Bone density is between 10 and 25% below young normal. Fracture risk is moderate. Treatment is advised.
>-Recommendations: NOF guidelines recommend treatment for patients with a T-score of -1.5 and below with risk factors or -2.0 and below without risk factors. Effective therapies are available in the form of bisphosphonates, and Evista. Hormone therapy may be an option based on review of risks and benefits of treatment. All patients should ensure an adequate intake of dietary calcium and vitamin D.
>-Follow up: People with diagnosed cases of osteoporosis or at high risk for fracture should have regular bone mineral density tests.

7/29/05:

Pulmonary Clinic Follow Up

CC: Asthma

Symptoms: The patient has improved overall with her Advair. However, she continues to have exertional dyspnea. She continues to use O2 continuously. There is no purulent expectoration, fever, night sweats or chills. There is no chest pain or wheezing. She is compliant with the Advair and Singulair. She uses Albuterol pm, which is about 2x/day. She has had multiple testing and is here for follow-up after that. Her arthritis seems to be reasonably controlled. Her reflux continues.

Physical Examination: The hemoptysis is of great concern to me. I have reviewed the CAT scan of the chets performed on 6/15/05 did not show any significant parenchymal lung disease. There was no evidence of pulmonary embolism. The hiatal hernia was visualized. The echocardiogram on 7/20/05 revealed a diastolic dysfunction with mild pulmonary hypertension. Her RSVP was 38. The ejection fraction was 55% of predicted. Her Oximetry on 6/14/05 showed 94% saturation on 1 liter/minute oxygen. Her lung function test performed on 7/19/05 showed a ratio of 74. The FEV-1 still was 64% of predicted. There was no significant bronchodilator response. There was no long volume available. The FRC was reduced to 41% of predicted. The diffusion capacity was 53% of predicted but it normalized when corrected for lung volumes to 94%.

Impression/Plan: 1) The hemoptysis is of great concern. I have at this point scheduled a bronchoscopy for her. The CT scan does not show any significant pathology. The risks, benefits and alternatives of bronchoscopy were explained in detail to the patient. She understood and agreed to proceed. 2) Her EKG performed as a part of the work-up for bronchoscopy did not show any significant STT changes. There were a few PAC's seen on the rhythm strip. 3) In the

meanwhile, I have counseled her on several anti-reflux measures to decrease gastroesophageal reflux disease and continues to be on Nexium. 4) I have asked her to continue with Advair and Singulair for her asthma. 5) She is on oxygen continuously. 6) She is taking Zoloft for her depression that seems to work for her. The Singulair would also help with her allergic rhinitis. 7) I will see her back in about a week after the bronchoscopy.

8/10/05:
Preoperative diagnosis: hemoptysis
Postop: pending pathology
Description of Procedure:

> (Illegible) the bronchopulmonary segments were visualized. There were a few faint areas of venous telangiectasias seen in the left lower lobe bronchus as well as in the bronchus intermedius. These were very small areas. There was no active bleeding observed or any blood clots seen at all in the endobronchial tree. There was no other significant endobronchial pathology visualized. Bronchial washings were performed in the right middle lobe. The patient tolerated the procedure very well.

**Dr. Jason Givens, Medical Records, 6/14/05-9/7/05 (Tr. 459-484)**
6/14/05:
CC: SOB
HPI: This is a 47 yo lady, who has been complaining of SOB for the last several years. In 2003, she was diagnosed to have obstructive airway disease that was asthma/COPD. She has been on O2 for the last 2.5 years. She thinks her SOB has progressively worsened today to the extent that she can walk less than half a block a day. Her SOB is also worse at night. Other triggers of her SOB include exposure to smoke, pollen, particularly during the summer and sometimes any strong fumes or any smoke from fires. She has associated wheezing. She has cough and mucoid expectoration. In the last couple of weeks she has had a little blood streaking in her sputum once in a while, that does not seem to be persistent. There is no associated epistaxis. She does have a history of significant GI complaints. She has had history of GE reflux disease and was diagnosed to have distal esophagitis on 12/7/04 by Dr. Miller who had performed and upper endoscopy. She has had history of hematemesis in the past. She has allergic rhinitis but denies any significant post nasal drip currently. She denies having any abdominal cramping pain, subcutaneous nodules, skin rashes, or any heart disease. She does have a history of arthritis involving her knees as well as her fingers. There is no history of thromboembolism in the past but she does have a dull aching subssternal chest pain intermittently and sometimes this occurs with exertion. She also has some difficulty swallowing which has been going on for several months. I think that is the reason why she may have had the endoscopy before. She had been placed on Advair 100/50 about 2.5 years ago and she thinks it helps her. She continues on the same dose. She is on O2 1L/mintue continuously with a conserving device. She uses Albuterol pm which works out to be one or two times a day. She has also been on Singulair. She has been complaint with her medications according to her.
Impression: 1) She seems to have obstructive airway disease clinically with no history of smoking. She probably has asthma given her atopic features. 2) Allergic rhinitis, which may perhaps be contributing to her asthma. 3) Hiatal hernia/gastroesophageal reflux disease. I wonder

if it is causing any complications particularly in view of her previous episode of hematemesis as well as her history of difficulty swallowing. She follows up with her primary care physician for further evaluation of hte same. 4) Hemoptysis which may perhaps represented episodes of bronchitis in the last couple of weeks. She has been a non-smoker and does not have any history of malignancy otherwise. 5) obesity which perhaps may have contributed to the restrictive lung disease observed on the last spirometry. 6) Arthritis. This appears to be osteoarthritis according to the patient. 7) osteoporosis.

Recommendations: 1) obtain a full set of lung function tests including spirometry, lung volumes and diffusion capacity to further quantify lung disease. We will ambulate her on one 1/mintue and re-evaluate her oxygen needs to see if she needs any more O2. 2) I have increased her Advair from 100 up to 500/50 to augment her asthma control. She continues to be on Singulair. 3) She is on Prevacid for her gastroesophageal reflux disease and I have reiterated several dietary and life style modifications to decrease reflux. 4) She will benefit from nasal steroid perhaps to decrease symptoms of allergic rhinitis. 5) I would suggest obtaining a CT of the chest to visualize any significant pathology in view of her recent history of hemoptysis. 6) She is on Zoloft for depression. 7) I will also obtain an echocardiogram to rule out pulmonary hypertension as well as any LB dysfunction. 8) I will see her back in about 1 month or earlier if needed.

6/15/05:
CT Pulmonary Angiogram:
        -The CT pulmonary angiogram was performed with intravenous contrast. There is no evidence of pulmonary emboli. The lungs are clear except for linear atelectasis in the lung bases. There is a hiatal hernia noted. There is no pleural fluid or other change.
-Impression:
        -Negative CT scan of the chest for pulmonary embolism. There is a hiatal hernia noted.

7/19/05:
Diagnosis: Pulmonary hypertension
Computer Impression:
        -The percent predicted Dlco is 53% which suggests moderate Reduction in diffusing capacity. The ratio FEV-1/FVC is 74%, suggesting Mild obstructive lung disease. The percent predicted FVC and FTVC are less than 81%. Restrictive lung disease may be present; no improvement

8/23/05:
CC: asthma. Hemoptysis; allergic rhinitis; depression; mild pulmonary hyptertension
Symptoms: She underwent a bronchoscopy at Monogalia General Hospital because she had persistent hemoptysis. The bronchoscopy indicates a few areas where there were faint venous telanglectasia seen in the lower lobe bronchi as well as in the bronchus intermedius. These were very small areas which no active bleeding visualized. The cytology was negative. She has occasional flecks of blood in her sputum intermittently. She denies any chest pain. She has a

little bit of exertional dyspnea but overall was on Advair of 500 and Singulair. Her asthma seems to be reasonably controlled. She still has some cough. She denies any rhinosinusitis right now. Her reflux seems to be controlled well on the Nexium. Her depression appears to be reasonably controlled.

Impression/Plan: 1) She has asthma that seems to be reasonably controlled. I have asked her to continue the Advair as well as her Singulair. She uses Albuterol pm; 2) She continues to be on oxygen 1 liter/minute. She has pulmonary hypertension which perhaps may be due to her ongoing long standing lung disease.; 3) her arthritis seems to be reasonably controlled.; 4) Her allergice rhinitis is reasonably controlled. Her Singulair seems to be helping with that as well. 5) She is on Nexium for her gastroesophageal reflux disease.; 6) Her depression is controlled with her Zoloft at 50 milligrams everyday.; 7) The pulmonary hypertension appears to be mild. The right ventricular systolic pressure was estimated to be about 38; 8) I will see her back in about 5 months or earlier if needed.

8/30/05:

Subjective: This new patient presents to establish care. Past medical history and medications reviewed.. Regarding neck enlargement/mild difficulty swallowingL she thinks that she has had mild difficulty swallowing large pills and large bites of food for the past few weeks. No coughing on food or liquids. Regarding COPD: uses 1L of O2 nasal canula, advair, and albuterol. Doing well. Follows with pulmonary here; Regarding osteoporosis: on evista qd; recent dexamethasone scan reviewed. Regarding depression/anxiety: on zoloft; helps but she thinks it could do more than it is. No side effects from medication. She denies HI/SI. Regarding hearing loss: uncertain of etiology; R>L; uses aid in right ear; regarding allergies: good control on singulair

Objective:
    -General: patient is alert and cooperative. No actue distress. Skin warm and dry
    -Head: +normocephalic. +pharynx clear; +TM's clear; right hearing aide. +poor dentition
    -Neck: +supple, cervical LAD, possible thyromegaly; no thyroid bruit; no thyroid tenderness
    -Eyes: +PERRL, +EOMI
    -Lungs: +clear to auscultation bilaterally, negative wheeze, negative crackles, negative tachypnea
    -Heart: positive RRR, negative murmur and thrill
    -Abdomen: negative tender, distention, positive soft; obese, normoactive bowel sounds
    -Neuro: positive alert & oriented, CN 2-12 grossly intact, motor/sensory intact

Assessment: COPD, osteoporosis, depression, anxiety syndrome (tense/nervous), anxiety syndrome, allergy syndrome, bilateral hearing loss

Plan: thyroid/neck ultrasound, recent labs reviewed from Health Right, increase Zoloft to 100mg qd.; return to clinic 1-2 months; sooner if needed.

9/2/05:

Thyroid Sonogram:
    -Thyroid sonography demonstrates right and left lobe dimensions of 4.5 x 2.3 x 1.7 and 4.4 x 1.7 x 2.0 cm, respectively.

-Each lobe is slightly heterogenous. There is a 3 millimeter hypoerchoic nodule seen at the upper pole of the right lobe.

Impression:

-1) Slightly heterogenous thyroid; 2) 3 millimeter hypoechoic nodule at the upper pole of the right lobe. Follow-up thyroid sonogram in 6 months recommended.

9/7/05
Procedure Requested: Radioactive Iodine Uptake Scan
Reason for Request: Thyroid nodule; thyroid heterogeneity

**Morgantown Surgical Associates, Medical Records, 11/22/04-9/12/05 (Tr. 485-504)**
3/18/04:
Upper GI Series

-There is esophageal reflux. On one view only there is a suggestion of an ulceration at the EG junction. The stomach, duodenal bulb and C-loop are normal.

Impression: Ulceration seen in one view only at the EG junction, a mass/tumor/Barrett's esophagus could give this appearance. Direct visualization of this area may be necessary. Clinical correlation is required.

11/22.04:
S: This is a new patient to clinic today. She has been seen previously in Kingwood. She decided to come down this way. She has a lot of back pain and hip pain, really this has been going on for a week or so. She has a history of hiatal hernia. She takes Asofex, but she says is not strong enough and it is really not controlling her symptoms. She has a history of COPD, emphysema for which she uses O2 at night. She would like to use O2 in pm as well as prn during the day as well. She is taking Lodine 400 mg t.i.d. for her ongoing pain. She is complaining of having a lot of hematemesis for the last couple of weeks.
O: See chart for details
A/P: COPD; I did write her a prescription and told her we will fax it over to LunnCare for O2 as needed throughout the day. I told her she really shouldn't use this, except for when she needs it. Hematemesis: She will keep her appointment with Dr. Whitmore in Kingwood on Wednesday. I image. GERD: I gave her some Protonix to try. She is to discontinue her Asofex and try some Protonix instead and see if this helps her more; Back Pain: she continues her Lodine 400 mg 3x/day. I also gave her some Skelaxin to try one of those three or four times a day. She will give us a call if she needs more of those.; Dysphagia: The patient also complains of this. We are going to check a thyroid function today.

12/7/04:
Preoperative Status & Diagnosis:

-The patient was seen by me on 11/24/04 because of episodes of hematemesis off and on for the proceeding two weeks. This had occurred approximately three or four times. She had been started on Protonix three days prior to that office visit. She is on a variety of other medications including (illegible), zoloft, evista, clarinax, singulair, and albuterol. Because of her history of hematemesis, Upper GI endoscopy is indicated.

12/17/04:
-Still throwing up blood.
-Did we get report from Dr. Miller?
-Shows mild inflammation in esophagus, consistent with reflexes, continue (illegible) (illegible).

1/12/05:
Claimant has a problem with regurgitating or vomiting bloody and coffee ground material almost on a daily basis for several years. 2 years ago, she had upper GI series and ultrasounds and was found to have gallstones, a fairly large hiatal hernia and reflux. She has been treated off and on with various medications and she can't really tell me that any of them have been any benefit. She had her gallbladder removed. She had a CAT scan done which didn't show anything. The upper GI series alsoshowed an ulcer and she was taking a nonsteroidal at the time. She has stopped taking the nonsteroidal. She has an abnormal spine with scoliosis or kyphoscoliosis. She has a lot of bone and joint pain. She has taken Celebrex in the past though she is not taking anything at that time. She recently had an upper endoscopy by Dr. Miller and I have read his reports and they don't show much of anything which is a surprise with all of the symptoms she says she has. She said she continues to have problems. She is pretty sure it is not coming from her lungs. She feels like food hangs up on the way down. Dr. Miller didn't describe much of a hiatal hernia. Chest, heart and abdomen don't reveal anything other than that she is obese and overweight. She says she hasn't thrown up in 2 weeks and I notice that they put her on Prevacid about 3-4 weeks ago.
-I am going to recommend that she stay on the Prevacid another 3-4 weeks and keep a log of how many times she throws up and whether there is blood in it. If there is then I am going to have to do an upper endoscopy. Possibilities are contribution of bile to this situation but I am not sure why she continues to throw up. That may be a learned response. In any event, it is going to be a complex problem I think ti figure out or to make better and would like to try to avoid surgical procedures almost at all costs. She is to call back in 3-4 weeks and then will make decisions of whether she needs another endoscopy.

2/4/05:
Operation: Esophagogastroduodenoscopy
Indications: Persistent hematemesis
Procedure: The patient tolerated the procedure well. I am going to see her in the office in a couple of weeks and make further recommendations which probably will which probably will be double dose proton pump inhibitors for awhile. I am probably going to have to supply them to her because of her financial situation. Her body habitus and status and weight probably would preclude a good chance at a hiatal hernia repair as a curative procedure.

2/22/05:
OP f/u from EGD pt. states she continues to vomit blood 2x daily. Advair (illegible) BID, albuterol MDI AD, zoloft 50 mg, Evista 60 mg, Prevacid 30 mg, Singulair 10 mg, O2-24 degrees/7, promethanine syrup/PRN

-She says that she is still bringing up blood. I have questioned her as specifically as I can and I am not convinced this is coming from the esophagus, regurgitation. Other factors could be lung or post nasal because of her use of oxygen. I certainly didn't see any blood anywhere with the scope. She has been doing this for so long I am not sure if anything else is going to change. She gives me a list of physicians she has seen and none of them I can figure out to be a pulmonologist or anybody who would be giving her chronic oxygen therapy. I don't know what is wrong with her lungs but I suspect something is going on there. My suspicion is that this upper airway problem or post nasal dripping of blood, etc. It may not actually be blood. It may be just something that she perceives to be blood and to be something totally different and may be even irrelevant.

Recommendations: Are for Claimant to talk to her PA, get them to recommend a pulmonologist and possibly another visit to an ENT physician. She says that she saw a Dr. Wetmore and he didn't say anything was wrong but she can't tell me exactly when this was but it may ahve been up at Ruby ROC a year or two ago.

**Valley Health Care System, Medical Records, 9/9/04-9/8/05 (Tr. 505-512)**

9/9/04:
Physician's Diagnosis:
    -Axis I: Depression NOS
S: Was not able to tolerate this welbutrin. She vomited it bak up and did not try again. She is unchanged. She has good eye contact! She sleeps poorly. She denies SI but is worried about her treating (illegible).
Plan: Zoloft

9/23/04
Physician's Diagnosis:
    -Axis I: Depression NOS
S: Still having trouble with her son but she is able to sleep at a normal time anyway. She is chatty and stays active with (illegible). She has good eye contact. Denies SI and is sleeping better.

10/28/04:
Physician's Diagnosis
    -Axis I: MDD
    -Axis II: nothing
    -Axis III: Emphysema
    -Axis IV: Economic
S: states she is doing ok. She is arguing with her brother about trying to get her out of this house. She does not feel depressed. She is (illegible).
Plan: continue meds

1/6/05:
Physician's Diagnosis
    -Axis I: MDD

-Axis II: nothing
　　　　　-Axis III: Emphysema
　　　　　-Axis IV: Economic

S: States things are going fairly well. She is waiting for her money but is optimistic. She states Zoloft helps and calms her nerves.
O: Good eye contact, sleeping and eating well, good (illegible), (illegible), (illegible).
A: Doing ok but has situations of uneasiness
P: continue zoloft, verbal therapy.


3/3/05:
Physician's Diagnosis
　　　　　-Axis I: Major depression, moderate
　　　　　-Axis II: nothing
　　　　　-Axis III: Emphysema
　　　　　-Axis IV: Economic

S: continues to have difficulties with her son and his activities. She is having continuing confrontations
O: She is chatty, good eye contact, negative ST on O2, work on getting him evicted
A: Continues to have depression
P: Continue Zoloft.


5/12/05:
Physician's Diagnosis
　　　　　-Axis I: Major depression, moderate
　　　　　-Axis II: nothing
　　　　　-Axis III: Emphysema
　　　　　-Axis IV: Economic


6/2/05:
Physician's Diagnosis:
　　　　　-Axis I: Major depression; moderate
　　　　　-Axis II: nothing
　　　　　-Axis III: Emphysema
　　　　　-Axis IV: Economic

S: has tried to remove out of her mother's house. She has to have a spend down to be eligible for medicaid.
O: good eye contact, chatty, feels better since mike is out of her hair and will stay out of her hair.
A: Stressed but not depressed
P: Continue meds.


9/8/05:
Physician's Diagnosis:
　　　　　-Axis I: MOID, moderate-296.32
　　　　　-Axis II: nothing

-Axis III: Emphysema
        -Axis IV: Economic
S: Illegible
O: good eye contact, chatty, illegible, better for depression, has adequate energy
A: Depression improved
P: Continue Zoloft at 100 mg.


**Valley Health Care, Psychiatric Evaluation, 8/26/04 (Tr. 513-514)**
8/26/04
Idenitification: Claimant is a 47-yo white female who come in with a 3-pronged cane. She states that "A lot of things are getting me agitated." She states she got nervous approximately 3 years ago. A number of things occurred at that time. Her son, who had been adopted by her mother, and is now 25 years old, came to her to live after being at New Hope, South Carolina for treatment. He argues with her, he continues to live with her and her husband. She states that he stays up late. She can't go to sleep until he has gone to bed and is asleep. She argues with him and he argues back. They do not get along and it would help a great deal if he were not in the home, but she does not have the $70 to pay for the paperwork to be processed that is required to get him to become a ward of the state.
-She states her mother died about three years ago. She continues to miss her. She feels that part of the reason she has difficulty sleeping is because she is sleeping in her mother's room of hte house and has not resolved this issue. She denies ever having depression prior to three years ago when this started. She does not describe decreased energy. She does not describe decreased self-esteem but describes increased irritability and agitation and frustration. She occasionally will cry. She denies suicidal ideation. She denies restriction of interests, however, she does admit to reclusiveness. She states she does not like to go into stores. She has never liked crowded places. She has her husband do the shopping, but he can't manage the food card, so she goes in to do that. She states that he can read and write but he doesn't manage that card particularly well. The reason she does not go into stores is because, "people watch you." She feels she is disabled because of hearing loss, her emphysema and her GI problems.
-When asked if she heard voices, she states she recently heard a horn blowing that no one else heard. She denied seeing visions. She went to the 9th grade but stopped because boys were looking up her dress. She got her GED at a later time. She was married three years shortly after she quit school and this man beat her. He is the father of her 2 children, the other two are by her present husband.
Mental Status Exam:
        -Examination reveals an alert, cooperative woman who spoke coherently and well and had good eye contact. Her facies were somewhat flat. Her affect was somewhat blunted. She denied any of the attributes of psychotic processes and I agree with that. She claims she is depressed but this is an atypical depression. We will call it Depression NOS, single episode.
Plan:
        -She will start on Wellbutrin and return to see me in approximately 1 month


**Dr. James Benjamin, CT Scan of the Neck, 9/29/05 (Tr. 515)**

Indications; thyroid module
Procedure: haliral (illegible) (illegible)
Results: The thyroid gland is mildly centered. It is slightly heterogenous in (illegible) (illegible).
Impression: 1) Mild golter. No suspicious thyroid masses were ID'd by CT. A subtle hypocchole
module is seen (illegible) (illegible).

**Preston Memorial Hospital, Addendum to Barium Swallow, 10/5/05 (Tr. 516)**
10/5/05:
-Addendum to Prior Barium Swallow
>*Repeat cervical esophagogram shows that there is little change in its appearance since
>the prior exam in March 2004. Slight extrinsic pressure on the cervical esophagus on the
>right due to thyroid enlargement on the right would be difficult to exclude. There is no
>other abnormality during swallowing ID'd. There appears to be a hiatal hernia present.
-Impression:
>*Cervical esophagogram shows mild extrinsic pressure on the cervical esophagus due to
>thyroid enlargment on the right. There is no other abnormality. There is a hiatal hernia
>noted.

**Dr. William Fremouw, Mental Status Examination, 5/5/2006 (Tr. 537-540)**
CC: "I have bad breathing. I have COPD, asthma. I had depression for three years. She reports
she has been treated for depression since her mother died in approximately 2002. This is
characterized by low energy and crying. She is treated with Zoloft 100 mg for that. Depression is
secondary to her COPD. She has never worked except for the summer youth program years ago.
She is in the process of appealing SSD. She went to the 9th grade and later earned her GED. She
has never been hospitalized for depression. She goes to Valley every three months for
medication checks.
Presenting Symptoms/Physical:
>-She has problems with endurance breathing. She has problems with his hip and back for
>which she uses a cane. She has difficulty sleeping. She wakes up early because of
>breathing problems. Her appetite is adequate. She is overweight. She does not cry. She
>has never been suicidal or homicidal. Her mood is frequently down. She has no phobias,
>panic, or PTSD.
Mental Status Examination:
>-Appearance: Claimant had an unusual appearance because of the oxygen, the cane, and
>the WVU letter jacket.
>-Attitude/Behavior: Cooperative. She sat calmly and smiles.
>-Social Skills: good
>-Speech: adequate
>-Orientation: She was oriented x4
>-Mood: Terrible today. She said in a freindly smiling manner.
>-Affect: appropriate
>-Thought processes: thought processes were logical and coherent
>-Future: She sees no change

    -Thought content: no delusions and no obsessions
    -Perceptual: No hallucinations or illusions.
    -Insights: she states the Zoloft helps some to decrease her crying
    -Psychomotor Behavior: no agitation, pacing or fidgeting
    -Judgment: within normal limits
    -Suicidal/Homicidal ideation: none

Social Functioning: she does not go to church or any clubs. She is home with her husband each day.

Daily Activities: She gets up at 4am because she can't sleep. She does light housework. Her husband does the majority of it. She doses and takes naps during the day. She goes to bed at 9 pm. She only gets out to doctors appointments. They do not have running water, so they sponge bathe. Her husband does the shopping and cooking. He drives her. She has no active hobbies.

Subjective Symptoms: "I have trouble breathing."

Objective Symptoms: She is on a medium dose of Zoloft for crying and sadness.

Diagnostic Impression:
    -Axis I: Dysthymia, mild
    -Axis II: No diagnosis
    -Axis III: COPD

Prognosis: guarded

Capability: She is competent to manage disability benefits in her own bets interests.


**Dr. Monderewicz, Internal Medicine Examination (Tr. 541-548)**

CC: This is a 48 yo white female, claiming disability, stating that she has asthma, hearing loss, and low back, hip, and knee pain.

HPI: Claimant reports having problems with chronic low back pain, right hip pain and pain in both knees since injury in a motor vehicle accident in 1991. She was seen in the ER at the time of hte accident. She reports having had x-ray of the lumbar spine and right hip, but no CT scan or MRI studies. There have been no EMG nerve conduction studies of the lower extremities. The claimant did undergo physical therapy and prior chiropractic manipulation which did help her symptoms, especially when she was placed in a stretch bed. The claimant has also had hearing loss in both ears and so she was prescribed a hearing aid for hte right ear around 1993. She was unable to afford an aid for the left ear. An otolaryngology progress notes from 1/19/06, indicates sensorineural hearing loss in both ears. The claimant says she was diagnosed with asthma in 1997 and also has allergic rhinitis symptoms, but denies undergoing any allergy skin testing. The claimant's prior medical records also indicated a diagnosis of emphysema, however, she has never been a smoker, and there is no family history of hereditary emphysema and a pulmonary progress note from Jan. 2006 only indicated severe asthma and allergic rhinitis. The Claimant reports becoming short of breath after walking more than 10-15 feet or climbing three steps. She has paroxysmal nocturnal dyspnea, which awakens her a couple of times a night. She sleeps upon 2 pillows. There is no history of congestive heart failure. The dyspnea is accompanied by cough and wheezing and she reports episodes of hemoptysis. The prior pulmonary progress notes indicates only a little bit of blood streaking with coughing. The note indicated that bronchoscopy performed in past, did not reveal any etiology for the hemoptysis. There is no history of tuberculosis. The claimant has not required any hosptializations for asthma exacerbations, and

she does not make trips to the ER. She uses inhalers and reports having a concentrator to which she only adds water, but she denies using nebulizer medications. She has been on supplemental oxygen for the past three years and currently uses 1 L/minute over 24 hours. The progress notes also indicated that hte Claimant has mild pulmonary hypertension and the CT scan was negative for pulmonary embolism in June of 2005.

Physical Examination:

-General: Claimant ambulates with a right limp. Uses cane with 4 prongs in left hand due to right hip pain.Claimant appears able to hear and understand conversational voice without difficulty using a right hearing aid.

-Chest: There is symmetrical excursion. AP diameter is increased with obseity. Lung fields are clear to auscultation and percussion, without wheezes, rales, or rhonchi. Breath sounds are symmetrical bilaterally. There is no accessory muscle recruitment noted. There is no chest tenderness to palpation. The Claimant did not exhibit any dyspnea with exertion with effort invovled with ambulation or range of motion testing within the examination room. She was able to perform the examination with removal of her supplemental oxygen. There was no orthopnea. There is no clubbing or cyanosis noted.

Impression:

1. Asthma with 24-hour supplemental oxygen use. 2) Bilateral hearing loss; 3) chronic low back pain with right sacroilitis; 4) possible osteoarthritis of the right hip; 5) arthralgias of hte knees; 6) possible peripheral artery disease in the right lower extremity; 7) six-month history of nocturnal chest pain.

Summary:

Claimant has a history of severe asthma, for which she uses 24-hour supplemental oxygen. On current pulmonary examination, the lungs were clear bilaterally, and the claimant was able to remove her supplemental oxygen to perform the remainder of the examination. With the amount of effort required in ambulation and range of motion testing in the examination room, she was not noted to have any dyspnea and there was no orthopnea. The claimant complained of chronic pain of the low back, right hip, and both knees. The back pain appeared related to the right hip, with tenderness over the sacroiliac joint on the right side and possible osteoarthritc changes in the right hip, since Patrick testing was positive particularly on the right side, with a mild decrease in flexion and abduction of the right hip. There was no tenderness directly over the lumbosacral spine and there was no evidence of radiculopathy to the lower extremities. However, there is question of whether some of hte claimant's symptoms might be related to peripheral artery disease in the right lower extremity, since pulses and capillary refill appeared diminished compared to the left side. The claimant complained of pain and swelling in the knees. On knee examination, she was only noted to have some swelling over the right knee and no other abnormal findings of the knees. It is not known how much of her symptoms are related to referred pain from the right hip or possibly the diminished pulses in the right leg.

-Claimant also reported experiencing nocturnal chest pain over the last six months, which may be related to her asthma, since she described it as pleuritic and worsens when she lays down and has increased SOB.

-Also, she has a history of GERD with hiatal hernia. However, she has not undergone any

cardiac evaluation, by her report and since she may have peripheral artery disease in the right leg, further evaluation may be warranted. Although the claimant has a history of bilateral sensorineural hearing loss, I did not note any significant impairment with her ability to hear me during the interview and the Claimant's own speech sounded clear. She only had a hearing aid for the right ear. Hearing is decreased to finger rub in both ears. Incidental findings on musculoskeletal examination include evidence of left medical epicondylitis and some tenderness and mild decreased range of motion of the cervical spine. The Claimant's moderate obesity contributes to the stress on the low back and weight-bearing joints.

**Dr. Tasneem Doctor, Psychiatric Review Technique, 3/1/06-5/15/06 (Tr. 549-562)**
-Medical dispositions: Impairments not severe
-Category upon which the medical disposition is based: 12.04 affective disorders
    *A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Dysthymia, mild
-Mild Limitation in:
    *Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace
-No limitation in:
    *Episodes of decompensation, each of extended duration
-Evidence does not establish the presence of the "C" criteria
-Consultant's Notes:
    *Ct. Appears credible. Claimant alleged depression and anxiety at fo. Claimant takes Zoloft for depression. Tx records indicate that Zoloft helps w/depression. Claimant states that ADL's are limited due to asthma and pain inback, hips, and legs. Claimant is able to use public transportation, pay bills, handle savings/checking, shop in stores w/husband and light cleaning. Husband does most household chores due to her physical problems.
    *Social functioning at the eval, was wnls, however, she does not have regular social activities. She talks on the phone once a month, and spends most days with her husband at home.
    *C/P/P: Concentration was mildly deficient. Pace and persistence were reportedly within normal limits at CE.
    *Claimant is assessed for 12.04. Claimant exhibits mild limits in all areas due to dysthmia. ADL's are mostly limited due to physical problems. There is no evidence of significant limitations due to a mental disorder.

**Dr. Cindy Osborne, Physical Residual Functional Capacity Assessment (Tr. 565-572)**
Primary Diagnosis: COPD; Secondary Diagnosis: Chronic back pain syndrome
Exertional Limitations:
    -can occasionally lift and/or carry 10 pounds
    -can frequently lift and/or carry less than 10 pounds
    -can stand and/or walk for a total of at least 2 hours in an 8-hour work day
    -can sit for a total of about 6 hours in an 8 hour workday
    -can push and/or pull unlimited, other than as shown for lift and/or carry

-Decrease walk/stand to 2.5 hours in an 8 hour workday due to back pain and COPD with 24/7 O2 usage

Postural Limitations:
    -Can Occasionally do:
        *Climbing ramps/stairs, balancing, stooping, kneeling, crouching, crawling
    -Can never do:
        *Climb ladder/rope/scaffolds

Manipulative Limitations
    -None established

Visual Limitations
    -None established

Communicative Limitations
    -None established

Environmental limitations
    -Avoid concentrated exposure to:
        *Extreme cold, heat, wetness, humidity, hazards
    -Unlimited:
        *Noise, vibration
    -Avoid even moderate exposure to:
        *Fumes, odors, dusts, gases, poor ventilation

Symptoms:
    -Claimant states that she requires some assistance with dressing, caring for her hair and shaving. Does not do any work around the house. Can walk 10 feet before needing to stop and rest, can resume walking in 10 minutes. States that she needs a cane for walking, CE shows that she can walk without the use of the cane. Considering the medical in file and Claimant's function, Claimant appears to be partially credible. Was able to perform CE tasks without her O2 and did not appear to be significantly dyspneic or in distress. Decrease RFC to sedentary with limitations as indicated.

**Dr. Porfirio Pascasio, Physical RFC Assessment, 10/4/06 (Tr. 682-689)**

Primary Diagnosis: COPD/ Chronic Back pain syndrome; Secondary diagnosis: essential & pulmonary hypertension

-Exertional Limitations:
    *Can occasionally lift and/or carry 10 pounds
    *Can frequently lift and/or carry less than 10 pounds
    *Can stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday
    *Can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
    *Can push and/or pull unlimited, other than as shown for lift and/or carry
    *May walk &/or stand 2.5 hours in an 8 hour workday

-Postural Limitations:
    *Occasionally:
        -climbing ramp/stairs; balancing; stooping; kneeling; crouching; crawling
    *Never:

-climbing ladder/rope/scaffolds
-Manipulative Limitations:
        *None established
-Visual Limitations:
        *None established
-Communicative Limitations
        *None established
-Environmental Limitations:
        *Avoid concentrated exposure to:
                -Extreme cold, heat, wetness, humidity, & hazards
        *Unlimited exposure to:
                -noise, vibration
        *Avoid even moderate exposure to:
                -Fumes, odors, dusts, gases, poor ventiliation
Symptoms:
        -See initial RFC; I agree with prior evaluation that Claimant is partially credible.
Treating or Examining Source statements:
        -T/P Shekhar Ghamande, MD–moderate persistent to severe asthma. Significant
        limitation of her daily activities due to her exertional dyspnea and she is not able to work.
        -"I disagree with Dr. S. Ghamande that Claimant could perform a sedentary type of
        work."


**Dr. Shekhar Ghamande, Letter from Pulmonary Clinic (Tr. 591-592)**

To Whom It May Concern:
-Claimant has been under my care for her pulmonary problems. She has moderate persistent to severe asthma. She has significant limitation of her daily activities due to her exertional dyspnea and she is not able to work due to that. She wears oxygen continuously for the same reason.
-her last lung function test performed in December 2005 had indicated her FEV1 was 40% of predicted. It was 1.04 liters. There was a significant bronchodilator response with that.
-In addition to that, she also has other medical conditions including allergic rhinitis, gastroesophageal reflux disease and depression.
-I hope you find this letter useful in your assessment.
-Please feel free to contact me with any questions or comments. I will be happy to provide any additional information required.


D.    <u>Testimonial Evidence</u>

        Testimony was taken at the hearing held on May 15, 2007. The following portions of the

testimony are relevant to the disposition of the case:

        ALJ    Yes. This is Judge Moon from the Social Security Administration. We're here in
        Morgantown, and we've just gone on the record. We have the Claimant, Cindy Pifer,

vocational witness, the Claimant's representative, myself, and a hearing assistant here. The - - I'm going to go ahead and - - representative, you've had a chance to look at the file or at least review the documents that's in the file?

\*        \*        \*

ALJ     Okay. The issues that we're here on is the Claimant's application for benefits under Title XVI or supplemental Social Security disability benefits. The application was filed on May 11 of 2004 with a protective filing date of April 28 of 2004. I had made an unfavorable Decision which was remanded by the Appeals Council after submission of additional evidence at the Appeals Council level, which I believe in part was a letter from Dr. - - I guess it was Dr. - - who was the lung doctor that she was seeing?

ME     DelMonte [phonetic]?

ALJ     I believe that's correct, yes.

REPR   DelMonte.

\*        \*        \*

ALJ     For the electronic record I'm going to identify the records that have been marked as exhibits. We have in the A section documents that are referenced as - - prefaced with an E - - 1 through E8A. The "E" being a designation that this is the fourth or fifth time the Claimants had a hearing before an Administrative Law Judge. In the B section we have E1B through E16B. In the D section we have E1D through E5D. In the E section we have E1E through E26E. 26E being a statement that the Claimant brought today, and I don't know if you have seen this statement, if the rep has seen this statement. Have you seen this statement from Health Right?

REPR   Yes, I have.

ALJ     Okay. We've marked that - - it's a statement from a Carol Renner [phonetic] who's a medical social worker. And then 25E is the List of Medications that the Claimant is taking. And I assume you - - did you prepare that, Cindy?

CLMT        Yeah, I wrote that down there.

ALJ         Okay. And in the F section we have documents that are marked E1F through E36. And it looks like we have some additional documents, request for medical advice, that we'll have to mark as E37F. And they also have documents in this section that have - - from an earlier hearing, have a preface of D, and also some Appeals Council exhibits.

\*        \*        \*

ALJ         Just let me - - I haven't sworn in the witnesses. Okay. I'm going to ask some questions from the Claimant first. I'm going to be fairly brief with those. Then I'm going to go to the doctor's testimony. I think that one of the issues that was - - the case was remanded for was the question of whether or not the Claimant had to be on continuous oxygen. There was no medical evidence, or at least no document signed by the doctor, indicating that she needed continuous oxygen at the time that I made the Decision. I think then that there was submitted to the Appeals Council a letter, and I'm not sure that doctor - - the Appeals Council when they remanded it said it was an unsigned letter, but anyhow it was purported to be from her treating lung doctor that said that she needed it. I'm not sure. Do you know what the exhibit number is?

\*        \*        \*

(The claimant, CINDY PIFER, having been first duly sworn, testified as follows:)

EXAMINATION BY ADMINISTRATIVE LAW JUDGE:
Q      But ma'am, let me just - - would you just state your name for the record please?
A      It's Cindy L. Pifer.

               *          *          *

Q      Okay, all right.  Now I want to - - just briefly tell me about your - - you have an oxygen - - your oxygen with you here today.  And do you use it all the time?
A      Yes, sir, I do.
Q      And how long do you use it for?
A      It's - - I got the concentrator at the house.  I use this when I go to town.  And then when I go back to the house - -
ME      Judge, can't hear her.
CLMT      When I go back to the house I use that concentrator.  It's called a concentrator.  It's got oxygen in the concentrator.  And I take - - when it gets near, then I go back to the house and I get on it.

BY ADMINISTRATIVE LAW JUDGE:
Q      So you have a portable oxygen tank with you here today?
A      Yes, sir.
Q      Okay.  And how long does that tank last?
A      About three to four hours.  That's it.
Q      And what do you do if you're away from your house then?  You just turn it off, or if it runs out - -
A      I bring an extra one.
Q      And about how long have you been using oxygen?
A      Oh, gosh.
Q      I think the records would indicate that maybe in 2004 sometime.
A      Somewhere around like that.  I think that's when it was.
Q      Okay, all right.  So have you had any incidences where you've had to go to the hospital because you've had problems with your breathing in the last - -
A      No, sir.
Q      Since you were here the last time?  Okay.  Now you have - - you take medication for asthma?
A      Yes, sir.
Q      And do you use any - - besides taking the medication - - and tell me what you're taking for your asthma.
A      One of it's called Singulair.
Q      And when do you take that?
A      I take that at bedtime.  That's nighttime.
Q      Okay.
A      And I take Albuterol.  I take it when I need it through the day.
Q      And you have like a little inhaler that you use or a puffer?
A      Yeah, a little inhaler.  Yeah.

Q    Okay.

A    And I've got - -

Q    And that's just on an as needed basis?

A    As needed, yeah.   Yes, sir.

Q    Okay.

A    And Advair - - let's see.  Advair 500 over 50.  That's twice day.

Q    Okay.  And that's something you just - - you have - - is that also an inhaler that you use?

A    Yes, it is.  Yeah, an inhaler.  And I'm on Spiriva now.  It's called Spiriva.

Q    Okay.  And how do you take that?

A    You take that in a little container.  Put a little - - put the pill down in this thing.  And then, you know, like cut it inside.  And then you inhale it.

Q    You inhale it, okay.

A    Inhale the medicine and throw the capsule away.

Q    All right, so - - but it doesn't take you very long to take the medicine as such?

A    No.

Q    Do you use a nebulizer to take any of your medicines?

A    No.  I just use that - -

Q    Basically - -

A    Yeah.

Q    - - you're either taking a puffer or pill form or you're inhaling?

A    Yeah.

Q    Okay.  And you haven't had any situations, I guess, since you were here the last time - - which was in, I guess, 2004.  You haven't had any situations where because of your asthma you had to go to the hospital and get a treatment.  You medications have been able to control your asthma?

A    It's been controlled, yeah.  But sometimes - - you know, sometimes I can't breathe, but I can't go to the emergency room, because the hospital [inaudible].

Q    Okay.  What do you do in those situations?

A    I just, you know, relax and try to inhale just like he tells me to, you know.

Q    Okay.  Now did you drive here today?

A    No, sir.  My husband brought me.

Q    Do you have a valid motor vehicle license?

A    No, sir.

Q    How do you get from place to place then?

A     Senior Citizens.

Q    They have a bus service or something you can - -

A    Yeah, it's transportation.  Yeah, they - -

Q    Now your husband, does he work?

A    No.

Q    Is he on disability?

A    No.

Q    What income do you have of your own at the present time?

A    He goes, helps, you know, my brother landscaping.

| | |
|---|---|
| Q | So he works whenever he can? |
| A | Whenever he can, yeah. |
| Q | Okay. But with respect to you getting any assistance from the state, like food stamps or anything else like that? |
| A | I did until they cut me off. |
| Q | And when did they cut you off? |
| A | This month. |
| Q | And what were you getting before? |
| A | $140. |
| Q | For food stamps? |
| A | Yes, sir. |
| Q | Now did you get any cash assistance? |
| A | No. |
| Q | So why did they cut you off? |
| A | I don't know. They just cut me off. They said we have too much asset. I don't know where they get all that. You know, we own the property in Tunnelton, you know, and you know how that works. |
| Q | Okay. Well, there was some records in the - - I thought you had disposed or sold the property in Tunnelton. |
| A | Well, I mean we don't own it, but we just own the trailer. |
| Q | You own the trailer, okay. |
| A | Just the property - - we just got rid of the property, but we just got the trailer. |
| Q | Trailer, okay. And who - - |
| A | That's why we left - - |
| Q | Do you rent that to somebody or does someone use that? |
| A | No. We could just stay there. That's why we moved back in the trailer. We own it. |
| Q | Okay, so now tell me about your daily activities that - - tell me, you know, do you take care of the housework? |
| A | I try. I try. You know, I have a hard time getting out of bed the first thing in the morning, you know. And I try to do a little bit of sweeping, and it's just hard. You know, I can't catch my breath. |
| Q | Okay. |
| A | And I try to do some dishes and stuff like that. It's just hard. |
| Q | Do you still see Dr. - - I guess the lung doctor that you had seen when you were here the last time? |
| A | I can't see him right now because I don't' have the Medicaid for it. I'm still fighting on it. I ain't had it for two years. |
| Q | Two years you haven't had it? |
| A | Two years I ain't had no Medicaid card. |
| Q | Okay. |
| ME | I didn't hear her, judge. |
| ALJ | She says for two years she hadn't had a Medicaid card. |

BY ADMINISTRATIVE LAW JUDGE:

Q    How do you pay for your oxygen?

A    Well, they're getting ready to come get it here pretty soon if I don't get no Medicaid card.  That's why I'm still working on it.

Q    Well, I guess.  But have you - - I mean, how much does it cost?

A    It's $417 a month, you know, to rent.

Q    Okay.  And that includes the oxygen?

A    Yeah, the portable, and yeah.

Q    So who's paid the $417 a month for the last two years if you haven't been on Medicaid?

A    I haven't been paid anything on it.  That's what I said, the welfare don't even want to help me or nothing.  That's what Rob, the manager at Lynn Care [phonetic], he said he told them, you know, we need - - you know, the bill, we need to get it paid.

Q    Okay.  So they've been continuing to supply you with oxygen for the last two years -

A    Yeah.

Q    - - even though you haven't been paying anything on it.

A    Yes, sir.  They know I need it.

Q    That's because you haven't had Medicaid?

A    Since I don't have Medicaid.  That's why.

Q    And the state of West Virginia hasn't assisted you?  I mean, I'm not quite sure how that works, but many - - the people that are usually getting assistance, they usually have medical coverage.  And you apparently had gotten some assistance or the food stamps.  So did you - - were you just getting - - how were you getting your health care then if you didn't have Medicaid?

A    I was going down here to Morgantown Health Right.

Q    Health Right.  And that's a free clinic?

A    Yes, sir.

Q    And - - but they don't pay for the oxygen?

A    No.

Q    So Lynn Care has just been footing the bill?  I find that unusual that they would be doing that.  It's 400 bucks a month, and for two years they've been supplying it.

A    That's what he said the last time I was talking to him.  He said we got to get something accomplished here.  I said I know, you know.

Q    Okay.

A    I've been working on it.

Q    All right.  So do you have other problems that you feel keep you from working besides your becoming short of breath?

A    I have back problems, and you know, my hips and stuff.  And my feet swells and I got arthritis and stuff in my hands.  I drop stuff.

Q    Okay.  Have you had any surgeries since you were here last?  I mean, either on your back or your - -

47

| | |
|---|---|
| A | Not on my back and stuff. The only thing I had like, I think it was a hysterectomy and gallbladder removed and fibroid tumor at that same time. |
| Q | But that hasn't been recent has it? |
| A | No. |
| Q | Okay. |
| A | That's been - - |
| ME | I didn't hear her, judge. |
| ALJ | She - - will you just say that again? |
| CLMT | Only thing I had surgery was gallbladder and fibroid tumors and hysterectomy. That's the only ones I've had. |

BY ADMINISTRATIVE LAW JUDGE:

| | |
|---|---|
| Q | And that hasn't been within the last couple years? |
| A | No. |
| Q | Not since - - you haven't had any surgery since you were here the last time in 2004? |
| A | No. |
| Q | Okay, all right. So when you go grocery shopping, where do you normally go to do that? |
| A | We go to Grafton. |
| Q | And how long does it take you to do your grocery shopping? Do you go to like a Giant Eagle or - - |
| A | Sav-a-Lot in Grafton. |
| Q | Sav-a-Lot, okay. So about how long does it take you to do that? |
| A | About ten minutes. |
| Q | So do you walk through the aisles and push the cart, and your husband gets the food and puts it in the cart? |
| A | He pushes the cart. |
| Q | Okay. You just walk along with him? |
| A | Yeah. |
| Q | The - - does that - - do you have any problem with being short of breath as long as you've got your oxygen? |
| A | As long as I've got this oxygen on, I'm fine. |
| Q | Okay. Now do you go without your oxygen occasionally? |
| A | Yeah, I take a break from it once in awhile. They said you could take a break because nose get stuck up. That's what I've been doing. I notice - - sorry - - that my nosebleed once in awhile. They told me to use that nasal spray. |
| Q | Right, okay. So when you take a break, I mean do you - - how long - - |
| A | For about five minutes. I'll put some nasal spray in, you know, because it keeps the nose - - moisture out of it. |
| Q | Okay. So, when's the last time that you've been back to see Dr., I guess, Jimandi [phonetic]? |
| A | Jimandi? |
| Q | Yeah. |

A      Oh, God. I forget what month it was. They told me not to go back to see him a Medicaid card.

Q      So it's been two years?

A      And I've been seeing - - there in Morgantown Health Right there's a Dr. Tiba, Lewis Tiba [phonetic].

Q      Okay. And so you've been seeing him for your lung problems?

A      Yes, sir.

ALJ      Doctor, is there any particular questioning before we take testimony from you that you need to elicit from the Claimant?

ME      Yes, sir, if you don't mind.

ALJ      Okay.

ME      Ms. Pifer, good morning.

CLMT      Good morning, sir.

ME      How long have you had trouble with your breathing?

CLMT      Oh, it's been quite a few years. It's been - -

ME      Judge, she's going to have to come a little closer to the microphone.

CLMT      It's been quite a few years. Since my dad passed away back in 1991.

ME      Is that when you first started having trouble?

CLMT      Yes, sir. And I didn't have no Medicaid card or anything back years ago.

ME      All right. But you didn't have trouble with your breathing as a child or when you were a teenager?

CLMT      Well, when I was young, my mom and dad gave me my dad's oxygen when I used it one time. And I didn't know why I needed it for, and I asked my uncle here. He said I had, you know, a little bit of breathing problem when I was young. I didn't know anything about it.

ME      Have you ever smoked?

CLMT      No, sir.

ME      Okay.

ALJ      Does your husband smoke?

CLMT      No, sir.

ALJ      So there's no smoke in the house?

CLMT      No.

ALJ      Okay.

ME      Do you wheeze every day, Ms. Pifer?

CLMT      Once in awhile.

CLMT      Yeah. When I, you know - -

ME      But you have some days that are better than others?

CLMT      Yes, sir.

ME      Okay. Judge, I believe I'm all right.

BY ADMINISTRATIVE LAW JUDGE:

Q      All right. Then let me just ask you, from a standpoint of walking, as long as you have your oxygen you can walk for 15 minutes at a time?

A      Yes, sir.

| | |
|---|---|
| Q | Okay. And what bothers you then after 15 minutes? Is it something else besides your breathing? |
| A | My back and my feet, and you know, my legs hurts. |
| Q | Okay. So it's not necessarily your breathing that causes you to stop after 15 minutes. It's your other problems. Your back or your arthritis? |
| A | Yeah. My feet swell so bad, you know, I can't hardly walk. [inaudible] put my shoes on first thing in the morning. |
| Q | Okay. What's your doctors - - what are your doctors telling you about your feet swelling? |
| A | He tells me to put me feet up on a chair or something, you know, where it's, you know, level. And I do that, you know. |
| Q | So does he say why your feet swell? |
| A | No, he never did say why. |
| ALJ | Okay. Let me go to the doctor. |

(The medical expert, DR. WILLIAM IRWIN, having been duly sworn, testified as follows:)

EXAMINATION OF MEDICAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

| | |
|---|---|
| Q | Would you just state your name for the record please, doctor? |
| A | William S. Irwin, Jr. |
| Q | Okay. And you're - - are you board-certified in any particular area? |
| A | I'm board-certified in internal medicine, board-certified in pulmonary disease. |
| Q | And you understand that your - - even though Social Security is paying you a fee today to testify, that you're here as an impartial witness? |
| A | Yes, sir. |
| Q | Okay. |
| A | Excuse me. Judge, I've got a post-nasal drip today. I'm sorry. I may have to clear my throat occasionally. I know it's annoying. That's the way life is. |
| Q | That's okay. That's not a problem. |
| A | All right. |
| ALJ | The - - does counsel - - does the representative have any objection to the witness serving as a - - Dr. Irwin serving as the medical witness in this case? |
| REPR | No, Your Honor. |

BY ADMINISTRATIVE LAW JUDGE:

| | |
|---|---|
| Q | All right. Have you had any prior professional or social contact with the Claimant? |
| A | No, sir. |
| Q | You've had an opportunity to review records in this case? |
| A | Yes, sir. |
| Q | And you've been present during the course of the testimony that we've elicited from the Claimant? |
| A | Yes, sir. |
| Q | And we talked about the areas of clarification, and you asked her some questions |

| | |
|---|---|
| | and we clarified those issues. |
| A | Yes, sir. |
| Q | Could you list the impairments in the record that are demonstrable by medically acceptable clinical and laboratory technique, particularly with respect to her breathing problems and her lung functioning? |
| A | Yes, sir.  I'm going to go back on the speaker phone, judge - - |
| Q | Okay. |
| A | - - and with the same comment I had before. |
| Q | All right, no problem. |
| A | Are you there? |
| Q | We're here. |
| A | All right.  The Claimant's impairments include bronchial asthma.  The chart says asthma at some places, chronic pulmonary disease other places.  From her history and from the lack of smoking, I think that the basic diagnosis, judge, is bronchial asthma. |
| Q | Okay. |
| A | She has gastric reflux with a history in the past of vomiting blood.  She has osteopenia.  She has a history of anxiety and depression.  History of bilateral hearing loss.  She is post-op for gallstones and fibroids, and she has a thyroid goiter. |
| Q | All right.  With respect to the Claimant's conditions, you're familiar with the Listing of Impairments - - |
| A | Yes, sir. |
| Q | - - under Social Security? |
| A | Yes, sir. |
| Q | Would you - - which of these areas - - or which of the section listing would be applicable in here, if any? |
| A | Well, her major problem appears to be her breathing, and so it would then be the section on pulmonary disease. |
| Q | All right.  With respect to her breathing there's a number of - - there's been a number of tests that she's had over the course of several years, and I'm - - some of them seem to be - - I mean, it seems to vary whether she gets a response from a broncholator or not, at least in some of these tests.  Can you rationalize those that, you know, the tests - - the differences in the testing of the pulmonary functioning? |
| A | I think so, judge. |
| Q | Okay. |
| A | She also has asthma.  I'm sorry.  Asthma is a disease that's caused by narrowing of the bronchus and some increased fluid within the bronchus, and this causes a wheeze, and this produces shortness of breath.  But the asthma's not the same all the time, day in and day out.  So it's not unusual for people to have good days and bad days with asthma, nor is it unusual for them to have pulmonary function studies on some occasions that are different from pulmonary function studies on other occasions.  So I would expect her if she had asthma to not have consistent pulmonary function studies because that's the nature of the disease, judge. |

Q       Because it depends on whether she's having a good day or a bad day with respect to her asthma when she takes the test?

A       It depends on - - a lot of it depends on, for instance, is it humid, is she tired, is her disease worse, has she taken her medicine or not taken her medicine? Or is this just a good day? And if you look through these studies, there are all kinds of numbers there, all kinds of values, particularly for the FEV1. And that doesn't have anything to do with whether she's trying or not. It has to do with the nature of this illness.

Q       Okay. So her tests would be - - and the results would be consistent with someone that had asthma?

A       Well, I think so, judge. And if I could just mention a couple of the results?

Q       Sure.

A       And I'm  - - I tried to mark these so I wouldn't have to look through the record. She had one - - where am I? I'm sorry, judge.

Q       That's all right. There is - -

A       She has - - on one of the studies in December of '05 she had an FEV1. That's the amount of air you can blow out in one second of 1.04.

Q       And that would be - - I think that would be a listing level. But if she had COPD - - but she doesn't have COPD - -

A       It would be a listing level. However, she got to 1.35 after bronchodilators, which means it's not a listing level.

Q       Right.

A       But she has that value. And then in August of '06, which I think may be her last one -

Q       Yeah. And I think that's at - -

A       FEV1 of 1.38. So there's a considerable difference there, and it would suggest that she's getting better, when in point of fact she's not getting better. It's just the nature of the illness.

Q       Okay. So the - - well, from a standpoint of - - she had this 1.38 on the FEV1, but she had no response - - I mean, if I'm looking at that test correctly, she didn't have a response - -

A       That's correct.

Q       - - to a broncholator. In fact, it was a negative response.

A       Well, yes it was. It was actually pretty much the same. The error that's built into that test is fairly large, judge.

Q       Okay.

A       So the difference is she didn't get a response to bronchodilators in. Now that could mean that she'd had her medicine fairly recently, fairly soon before she took the test. It could've meant that the test was not properly done. But it won't affect - - people who have asthma - - another definition of asthma is reversible obstructive airway disease. That defines asthma. And for the most part, Mrs. Pifer gets better with bronchodilators, as one would expect, with asthma.

Q       All right. But if we assume that she wasn't having a problem with her asthma in June of '06, I guess, the latest - - I guess it was August of '06. She still has an

|   | FEV1 that's significantly less than predicted. Now is that just a function of how hard the person tries, or what would account for, you know, only having about 60 percent of what the predicted value would be? |
|---|---|
| A | Well, people who have asthma, judge, don't have normal pulmonary function studies to start with. |
| Q | Okay. |
| A | So I wouldn't expect her to be normal. |
| Q | All right. |
| A | I've looked at the tracings where they - - I'm sorry - - the pulmonary function studies where the actual tracings are supplied look pretty good. And it looks like Mrs. Pifer tries, give a reasonable effort on these studies. |
| Q | Okay. |
| A | Bronchial asthma produces baseline alterations in the pulmonary function studies. |
| Q | And that's just the fact - - |
| A | Nature of the disease, judge. |
| Q | And that's because they just - - if you have the disease, then you're just going to have diminished capacity, just because you have the disease? |
| A | That's correct. Now some - - you know, the disease is different in everybody, judge, so there's no way to say everybody's going to do anything with disease. You know that by now. But we don't really expect people with asthma to have normal resting pulmonary function studies. One of the ways you diagnose asthma is to be able to determine that they have a response to bronchodilators. |
| Q | Okay. Now in conjunction with that June - - or that August of '06 test then, she also had, I guess, a six-minute walk test. Which I guess was - - it's the page before. |
| A | I don't know that I - - I've got one for September of '06. |
| Q | Well, maybe that's the one. I'm looking here. It's just - - says West Virginia University Hospital, Pulmonary Services, six-minute walk test. |
| A | I don't know. Would you give me the numbers, judge? |
| Q | Yeah. Well, the August 1, '06 test that we were just talking about - - |
| A | Yes, sir. |
| Q | - - that was E32F-3. And this six-minute walk test is E32F-2. |
|   | *          *          * |
| A | Okay. I think I've got what we need. Six-minute walking. |
| Q | Right. |
| A | Okay. And the second page is six-minute walk test. |
| Q | Right. That's what I'm referring to. |
| A | Okay. And on this - - |
| Q | Can you just explain to me why they do that test? |
| A | Well, what they try to do, judge, is sometimes if you have fairly significant - - let me rephrase that. Sometimes if you have a particular type of pulmonary disease or severe pulmonary disease, the amount - - the oxygen saturation will go down significantly. When I say significantly, I'm talking 10 to 15 percent with exercise. |

| | |
|---|---|
| Q | And that didn't happen in this case? |
| A | Well, actually, it went up in this case, for some reason. |
| Q | Okay. |
| A | She went from 92 percent baseline to 94 percent at the end of the test. And the only thing you can say about that is that it doesn't make any sense. |
| Q | Okay. |
| A | But what that would suggest is she does better with exercise than at rest, and that's not always true. |
| Q | If what? |
| A | Sir? |
| Q | It's not going to be true if she has asthma? |
| A | If she has asthma, yes, sir. |
| Q | Okay. |
| A | And exercise does not make asthma better. |
| Q | Okay. Is there some lung conditions where exercise helps? I don't know. When I had something, they gave me a little machine, and I was supposed to try to blow and keep the ball up in the air. |
| A | Yeah. |
| Q | And that was - - |
| A | That was to keep you from getting a collapsed lung. |
| Q | Okay. But I kind of viewed that as exercise. But - - |
| A | If that's your definition of exercise, judge, I wouldn't argue with you. |
| Q | Okay. Well, I mean, it was something where you're supposed to be working the lungs. |
| A | Something to keep the distal part of your lungs expanded. Had you been operated on? |
| Q | I really don't probably. I can't remember exactly what it was for. |
| A | They usually use those post-operatively or when people have had - - they usually use them post-operatively. It helps expand the lungs. |
| Q | Anyway, getting back to her test. So it looked like she didn't have a problem with oxygen saturation. But she had a lot of problem with apparently coughing or - - |
| A | What test are we talking about, judge? |
| Q | The six-minute walk test. |
| A | Okay. |
| Q | Isn't that what dyspnea is? |
| A | Unfortunately, judge, I lost my place. |
| Q | Okay. I'm sorry. |
| A | Hang on. You know what this record is like, right? |
| Q | I'm referring to the - - right - - the walking test. The six-minute walk test record. |
| A | Okay, let's see what it says here. |
| Q | And maybe it's difficult for you to read, but - - |
| A | No, but I'm not sure I'm reading what you're talking about. |
| Q | All right. |

A       I've got the six-minute walk test.  Did you say coughing?

Q       Well, dyspnea, d-y-s-p-n-e-a.  I guess - -

A       That's dyspnea.  Now where are we talking about that?

Q       Where?  Well - -

A       This is on 32F?

Q       Yes.  E32F and it's actually 2.

A       I can't tell if that's - - okay.

Q       Okay.  Well, it says six-minute walk test up in the upper left-hand corner.

A       Yes, sir, I have that.

Q       Okay.  And then it says - - gives her height and her weight.

A       Yes, sir.

Q       And then it says heart rate.

A       Yes, sir.

Q       Okay.  Then it says - -

A       Dyspnea.  Okay.

Q       Right.  And it says - -

A       Very slight.

Q       Right.

A       Very severe.

Q       Right.

A       Okay.  That's a little hard to explain, judge, because at the same point her oxygen saturation went up.

Q       Okay.  So - -

A       I'm not going to be able to explain that to you because I don't understand it.

Q       All right.  Could it be a psychological symptom?

A       It's hard to say that, judge. when you know you're dealing with somebody who has asthma.

Q       Okay.

A       Dyspnea, however - - dyspnea is shortness of breath and dyspnea is a sensation that you have.

Q       It's not necessarily an observable phenomenon?

A       It's not necessarily an observable sign.  It is a feeling that you experience.  It's a sensation.

Q       Okay.  So how do they rate that?  I mean this Borg [phonetic] rating is based on what?

A        I have no idea.

Q       Okay.  Well, I mean, it looks to me like it must be some type of scale.  And I guess they must either - - you know, either ask the person, you know, some type of criteria or - -

A       Judge, I have never seen that scale, and I'm not going to be able to explain to you how some physicians in West Virginia practice.

Q       Okay, all right.  But I mean, maybe Borg sounds - - Borg stands for something else.  But I was just assuming that that was some - -

A       Borg is a scale.

Q       Okay.
A       But I don't know what the scale is, judge.
Q       All right.  So what's this test tell us, if anything?
A       Doesn't tell me a lot.
Q       Okay.
A       It tells me - - it doesn't tell me a lot, as a matter of fact.  It doesn't make sense
        that her oxygen saturation goes up and her dyspnea is worse.
Q       Okay.
A       That does not - - that test says to me that I would probably try to repeat it and
        make some sense out of it, but I'm not going to be able to explain it to you, judge.
Q       All right.  So do you think that some  - - you know, that this - - that the Claimant
        needs to be on continuous oxygen?  I mean, is that something typical for someone
        that has asthma?  Because normally - - the people that I see that have asthma, they
        normally have the inhalers, and then they may use a nebulizer for treatments
        during the day.  But I can't say that I see very many of t hem, you know, that are
        on continuous oxygen.
A       Well, I'm going to have to agree with you, judge.  Most people - - I'm going to
        have to agree with you in that, as we've talked about, the natural history of this
        illness is that you get - - that you have good days and bad days.  And on a bad day
        she might need some supplemental oxygen periodically, but there's no evidence
        in the record - - I don't have any evidence that a physician said she needed it.
        And most of her resting oxygen saturations are round 96 percent.
Q       What would normal be?
A       Around 96 percent would be low normal for her.
ME          Ms. Pifer, are you 49?
CLMT        Yes, sir.
ME          At 49, ninety-six percent would be low normal.

BY ADMINISTRATIVE LAW JUDGE:
Q       All right.
A       Question then is, how much would you expect her to drop with exercise, with
        asthma?  And again, judge, that depends a little bit on what her situation is on any
        given day.  She went from 96 to 94 on one test, and 96 to 92 on another test.  So
        she has a drop in her oxygen saturation, but it's not a severe drop.  So I'm trying
        to get back to your question is, would she need continuous oxygen?  The studies
        would suggest that if she is totally at rest, she doesn't.
Q       Okay.
A       If she exercises, she might on some occasions.
Q       Okay.
A       On the exam that Dr. - - I'm sorry, judge.  On Exhibit E27F exam by Dr.
        Maunderwitz  [phonetic] - -
Q       Okay.
A       - - her comment is - - what is her comment?  Hang on a minute.
Q       There's a summary at the  - - on Page 6.

A      Yes.  I'm not finding what I want.  Hang on just a minute.

Q      Okay.

A      With the amount of effort required on ambulation and range of motion testing she was not noted to have any dyspnea, and there was no orthotomy [phonetic], which means shortness of breath.

Q      Okay.

A      On examination the lungs were clear, and the Claimant was able to remove her supplemental oxygen to perform the remainder of the examination.  Now there's not a lot of exercise on the patient's part in a physical examination, judge.

Q      Right.

A      By the same token, it suggests that she can take her oxygen off and is fairly  - - and is comfortable.  And her response to her question was, at the end of walking what stopped her - - and among the things that stopped her was her joint pain, as I understand the question, in addition to the shortness of breath.

Q      Right.  Well, I'm not sure that she had shortness of breath.  I thought she said that what stopped her - - because she had her - - she's walking with continuous oxygen.  I mean, I thought that her testimony was that, you know, it was her - -

A      You may be right, judge.  I'm sorry.  I don't want to make this record any more confused than it is.

Q      Okay, all right.

A      I'll retract that statement.

ALJ    So let me just ask the Claimant a question here.

BY ADMINISTRATIVE LAW JUDGE:

Q      When you did your walking test - - do you remember the test?  Apparently, they had you walk around a tract of some type?

A      The last time I know was down at - - over there at West Virginia University Hospital.

Q      Right.  And did they have you - - this would've been in June - - or I'm sorry - - August of last year.  So - - because that's what this report talks about, and it looks like it was August.

A      This last one he didn't.  He just had the breathing test done.

Q      Well, our dates may not, you know - -

A      Yeah.

Q      Our dates may not coincide.  What we were talking about was a test that you had - -

                       *            *            *

BY ADMINISTRATIVE LAW JUDGE:

Q      With respect to the - - I was asking about the walking test.  Do you recall the talking test?

A      I remember doing it.

Q      Okay.  And what type of - - where did they have you walk?

A      From one end of the - - like down at the hospital, down at University.  From one hallway back and forth.

| | |
|---|---|
| Q | Back and forth, okay. |
| A | Yeah. |
| Q | Because it talks about laps.  It says number of laps was five.  So you basically - - that was walking up and down a hallway? |
| A | Yeah.  In a hospital, yeah. |

*   *   *

| | |
|---|---|
| ALJ | Okay, all right.  Well, I was just trying to get some clarification of how they did the walking test, and the Claimant basically had - - says that they had her walk up and down the hallway. |
| CLMT | Yeah, the hallway.  Yes, sir. |
| ALJ | Right, okay. |

BY ADMINISTRATIVE LAW JUDGE:

| | |
|---|---|
| Q | All right.  So going back - - so what you - - it's your opinion that the Claimant does have asthma? |
| A | Yes, it is. |
| Q | Okay.  And with respect to that does she meet or equal any of the listings? |
| A | No, sir. |
| Q | Okay.  And with respect to if she doesn't meet or equal - - and "equal" would be something where she has a combination of impairments that might have the same effect as actually meeting the listing.  But with respect to the limitations, what type of limitations would you  - - based on the medical record that you've reviewed, would you find for the  - - |
| A | Are we talking functional residual capacity, judge? |
| Q | Yes. |
| A | I think her highest level would be sedentary. |
| Q | Okay. |
| A | Excuse me.  I'm sorry.  In addition - - and with the sedentary it's going to be restrictions on humidity - - high levels of humidity - - dust. |
| Q | Smoke? |
| A | Smoke.  Other environmental irritants. |
| Q | Okay. |
| A | I think there's one other step to that, judge - - |
| Q | All right. |
| A | - - and it's going to make your job tougher. |
| Q | Okay. |
| A | I think that she can do sedentary levels of work with the restrictions that we just mentioned.  I think it would need to be understood that on occasion she might have problems with shortness of breath.  Might need to use her oxygen while at work.  And might possibly have more absences from work than the normal employee. |
| Q | Okay. |
| A | It's hard to ignore the fact that asthma produces good days and bad days, judge. |
| Q | Right.  All right, well - - so what you're saying is you feel that she could do |

58

sedentary work.  She would have the environmental limitations - - you know, no work in high humidity, or extremes of heat or cold, or - -

A   Well, I think she would have to avoid environmental noxious agents, judge.

Q   Okay.  So basically, an office type environment or - -

A   Yes, sir, I think so.

Q   Okay.  With respect to the oxygen, you think she needs continuous oxygen?  I guess I may have asked you this already.

A   You have.  And there's no evidence that she does.

Q   Okay.  But when you said she might need to use the oxygen, you're saying that - -

A   There might be times during the day, or she might have times during a week, when at some point she needs to use supplemental oxygen.

ALJ   And then later on you started using it during the day?

CLMT   Yes, sir.

ALJ   Okay.  Is there any evidence that the Claimant hasn't received - - I mean, is she receiving appropriate medical treatment for her conditions?

ME   Well, I would think that she's not, if she hasn't seen a pulmonary specialist in two years, judge.


EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q   Okay.  Dr. Tibo, I mean, how often do you see him?  Tiba, I guess it is.

A   Let's see, I just seen him - - think it was March or April I seen him.

Q   And do you see him for your lungs?

A   Yes, sir.

Q   And what - - I mean, is he someone that specializes in - - or is her just an internal - - general internal medicine - -

A   He's - - I guess they call him a lung specialist.  Dr. Gomonti and Keenwood [phonetic].

Q   Okay, and so what - - when you see him, what does he have you do?  Does he listen to your breathing?

A   Well, yeah, the breathing and stuff like that.  Yeah.


EXAMINATION OF MEDICAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q   All right.  With respect to, let's say, the prognosis or the treatment for asthma on an ongoing basis is there - - you know, is there anything that the Claimant should be prescribed that she's not receiving?

A   I don't think so, judge.  I think her treatment plan appears good.  If she still weighs 198 pounds, it would help her a lot to lose a lot of weight.  And that would - -

Q   That would help with the functioning of her - -

A   Well, it would decrease the amount of work that it takes just to move around.

Q   Right, okay.  So the oxygen demand would be less?  I mean for - - obviously, if you're walking and you're moving 190 pounds, it's going to take more work and - -

A   It's going to require more work and more energy than if you were moving a

hundred pounds.

Q        Right, okay.

A        Now that doesn't mean the asthma is going to go away, judge.  It just means the work load decreases.

Q        Right.  All right.  What exercise-induced asthma?

A        Exercise-induced asthma is asthma that's brought on predominantly by exercise, as the name implies.  A lot of people has asthma just sort of sitting around and they'll have increasing trouble with asthma.   My daughter has asthma because she's allergic to cats, and when she gets around cats she has asthma.  There are people, particularly athletes, who have asthma that's only brought on by exertion.

Q        Asthma then is basically a response of the lungs in some - -

A        Asthma is an illness wherein the bronchi become hyper-reactive to either an allergent or to an infection, and respond to this by narrowing and by - - which means you've increased your - - making it harder to breathe.  And also by increasing the amount of fluid.  And a wheeze is just air blowing through a narrow tube with fluid in it, which in turn - - which becomes one of the airways if you have asthma.  You can have asthma because you're allergic to cats, or because you're allergic to any number of things, or because you have an infection.

Q        The attorney would be interesting.  Would that be more of a psychological reaction?

REPR            Would that not also be appropriate for an Administrative Law Judge?


BY ADMINISTRATIVE LAW JUDGE:

Q        The - - well, what's the irritant in exercise?

A        The amount of - - the speed with which the air goes in and out of the bronchus.

Q        And that's okay.

A        The speed - - the rapid airflow in and out produces a response in the bronchus that produces narrowing.

Q        All right.

A        Now - - but one final caveat of that, judge, is that if you have asthma and you want to get exercise, you can swim all day long and not get asthma.  Nobody's sure why.

Q        You would think it would have to be something about the - - I mean, the humidity.

A        Yes, you would.  It's never been proven, though, judge.

Q        So that's why people that - - because who's the swimmer that's - - some of these people are asthmatics, but yet they're Olympic - -

A        Oh, yeah, you can - -

Q        They can win the Olympic gold medals.

A        A lot of children go to swimming - - a lot of children with asthma go into swimming because you can do that with relatively little trouble.

ALJ             Does the rep have any questions for the doctor?

REPR            Yes, I do, Your Honor.

ALJ             Okay.

| | |
|---|---|
| REPR | Doctor - - |
| ME | Ma'am, if you don't mind, I'm going to put this headset down - - handset down, and try to use the speaker phone. Okay? |
| REPR | Sure. |
| ME | Hang on just a second. |
| REPR | Okay. We've established that the Claimant obviously has a very restricted work plan. I think the crucial question here is whether or not in your opinion Mrs. Pifer could sustain what - - gainful activity, regardless of whether that may be for employment purposes or any sustained activity. Could she do - - would she have to take frequent breaks, say - - an average person, say, with no disability would be able to work eight hours a day, five days a week. How would - - with the observation of the medical records that you have, would her employability be reduced by any capacity? |
| ALJ | He's - - now he's not the vocational witness. You may want to ask those questions of the vocational witness. He's really telling us what her limitations are, I mean, from what he sees from a physical standpoint. I mean - - |
| ME | I can approach that a little bit, though, judge. |
| ALJ | Okay. |
| ME | Counselor, there are probably millions of people in this country who work with asthma. Who have asthma and who work 40 hours a week, 50 weeks of the year. These people have a restricted workplace, as we've already listed, as the judge has already mentioned in his environmental restrictions. The question is, do they have to stop for medicine? And on some occasions they do. And as I mentioned to the judge, there might be a time that - - there might be instances where they would have to have more time off than the normal employee. but I think if there's a vocational expert there, then it's up to him to determine I think if such a job exists. |
| REPR | I don't have any other questions. |
| ALJ | All right. Doctor, is there anything else that you have any other observations on? I mean, concerning what limitation - - |
| ME | No, I think I've said enough, judge. |

*          *          *

EXAMINATION OF CLAIMANT BY REPRESENTATIVE:

| | |
|---|---|
| Q | As far as your daily activities, with respect to you depression, what symptoms or what problems do you have with regard to your depression? Do you have anxiety or do you have bouts of where - - crying spells or anything of that nature? |
| A | Yes, I have crying spells a good bit. |
| Q | How often does that occur? |
| A | It's been happening a good bit lately. Every day. |
| Q | How long does that last? |
| A | Probably about three or four hours. |
| Q | Out of a 30-day period - - how many times do you think out of that 30-day period that you have those days? |
| A | Like three or four. Maybe a little bit longer. It all depends, you know. |

Q     Do you experience mood swings?
A     Yes.
Q     Are there days that you don't get out of bed?
A     Yes.
Q     Is that due to - - what's the main contributor to that, that you would think, from your medical problems, from your point of view?
A     From my condition?
Q     Yes.
A     Well, I can't hardly get out of bed because of my back and my feet. And my arthritis in my fingers, they get so stiff I drop things.
Q     Okay. Do you have problems with bathing or brushing your hair, any personal hygiene?
A     I don't have a problem with that but I just - - my husband, he puts my shoes and my socks on in the morning.
Q     Is that every day?
A     Yeah, that's every day.
Q     What about doing household chores? Does anyone help you with that?
A     My husband.
Q     What does he help you with?
A     Washing the laundry and stuff in a wringer washer, and he hangs them outside on the line.
Q     Okay. As far as grocery shopping, you mentioned that you go with him.
A     Yeah. I go in with him, yeah.
Q     Who brings the groceries in the house?
A     Well, that's what I said. He goes to work with my brother, you know, once in awhile for - - they call landscaping. And that's how, you know, we get some groceries in.
Q     Who brings the groceries - - say you go to the store and - -
A     He does.
Q     Okay. As far as cooking dinner, what do you cook? Or do you cook?
A     Once in awhile he does the cooking. Because, you know, we save on - - he saves on the gas because we got ten-pound tank. It only lasts like a month.
Q     Okay. I'm assuming you're talking about propane gas?
A     Yeah, propane.
Q     Okay. As far as actually cooking meals, do you do that yourself?
A     No. My husband does.
Q     Okay. You ever fix dinner yourself or even lunch?
A     No, we don't fix lunch. We just fix a meal once a day, and that's it.
Q     Okay.
A     Well, he does, actually. And sometimes, you know, we'll - - him and I will have a sandwich or something for a snack.
Q     As far as doing the yard work, any outside work, do you do any of that at all?
A     No. He does all that outside himself.
Q     What do you do to pass your time?

A Well, I'll go outside and walk around.  Ain't got nobody to visit, so - - until my mother-in-law gets back up.  She's coming back up.  A little bit with her.

Q Now when you walk around outside, do you have any problems breathing at all?

A I have trouble breathing outside, yes.  Without the oxygen on, yeah.

Q Getting to your pain.  Say on a scale from 1 to 10, how would you rate your back pain in your leg and your hands?

A About a 9.

Q Is that every day?

A No, it's not every day.  Sometimes it's been about around 10.

Q Okay.  Does anything increase your pain or make it better?

A Make it better?  The only thing that makes it better is when I relax it a little bit.  Like, you know, go in there and lay across the bed in a certain way.  You know, like stretch a certain way, it relaxes your back.

Q Out of, say, a two-week time period how would you - - how many days do you experience pain?

A Every day.

Q Is there any days that you feel pain free?

A Every - - maybe once a week.  But I still like - - what's it called?  It's called Flexeril I'll take.  It helps.

Q Do you have any side effects from your medication?

A Some of them I do.

Q What kind of side effects would you - -

A They make you sleepy.

Q Is that the only side effect that you have?

A - - side effect is that what you're talking about?

Q Um-hum.

A Yeah, just - - that's the only thing they do is make you sleepy.

Q Do you take naps during the day?

A Yes.

Q How often?

A Probably sometimes twice a week.

Q How long do your naps usually last?

A Probably between 20 minutes and a half hour.  If the puppies don't come in and wake you up.

Q Okay.

A You know that is three of them.

Q All right.  Do you have any hobbies?

A No.

REPR Okay.  That's all I have, Your Honor.

BY ADMINISTRATIVE LAW JUDGE:

Q All right.  Now you have four boys?

A Four boys.

Q And do they live in your same general area where you live?

| | |
|---|---|
| A | No. My youngest one, he's in Ohio, Sebring [phonetic], Ohio, and he's planning on getting married this year. And Greg, he lives in Kingwood. One in - - somewhere in jail somewhere. And then the other one I used to - - you know, I'd [inaudible] South Carolina. Well, my husband went down and got him, and he's staying with my cousin - - |
| Q | Okay. |
| A | - - because he's a nurse. |
| Q | Does he have some type of health problems? |
| A | Yeah. He takes seizures. |
| Q | And he's on disability? |
| A | Yeah. He's on disability. |
| Q | Does your family - - I mean, do you get together on like Thanksgiving or holidays? |
| A | No. |
| Q | Do you ever go visit your children? |
| A | My relation? Or my children? |
| Q | Yeah. |
| A | No. I can't afford the gas. |
| Q | They ever come to visit you? |
| A | Well, Greg, he can't. He don't have no driver's license. And Mike, he don't have no driver's license. He calls once in awhile. And - - |
| Q | Do you have grandchildren? |
| A | No, not yet. |
| Q | Do you go to church? |
| A | Not lately. I ain't been back since my dad passed away, you know. |
| Q | So - - |
| A | I didn't want to get back to church. |
| Q | - - do you have friends in the area where you live that you see or talk to on a regular basis. |
| A | No, sir. |
| Q | So you have your animals. Do you take care of them? |
| A | No. Well, my husband does. He feeds the dogs. |
| Q | Now you mentioned you don't have a garden or - - |
| A | No. |
| Q | Do you raise vegetables or anything like that? |
| A | We used to but not now. |
| ALJ | Okay. I'm going to go ahead and ask some questions of the vocational witness. |

(The vocational expert, JOHN PANZA, having been duly sworn, testified as follows:)

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW
JUDGE:

| | |
|---|---|
| Q | Would you state your name for the record please? |
| A | John Panza. |

| Q | Have you had any prior conversations with me, the Claimant, or the Claimant's representative concerning the merits of the case? |
|---|---|
| A | No, sir. |
| Q | Familiar with the regulatory definition of unskilled, semi-skilled, skilled/ sedentary, light, medium, heavy, and very heavy work? |
| A | Yes, sir. |
| Q | Are you personally acquainted with the Claimant? |
| A | No, sir. |
| ALJ | Does the representative have any objection to the vocational witness - - |
| REPR | No, Your Honor. |
| ALJ | The Claimant was born on January 19, 1958. Would be considered as a younger individual at all times relevant, although she will turn 50 in January of 2008 at which point she would be someone closely approaching advanced age. She has a high school education. You got - - you went to school until the ninth grade, and then you later got a GED. Is that correct? |
| CLMT | Yes, sir. |
| ALJ | Okay. Have you had any additional educational training after you got your GED - - |
| CLMT | No, sir. |
| ALJ | - - or have any formal vocational training to learn a skill or trade? Like barber, plumber, carpenter? |
| CLMT | No, sir. |
| ALJ | And just have you had any work - - have you done - - have you worked, let's say, since 1999? |
| CLMT | No, sir. |

BY ADMINISTRATIVE LAW JUDGE:

| Q | All right. So basically we have someone that has a high school education and no formal vocational training. Considering the vocational evidence of record do you agree with that assessment? |
|---|---|
| A | Yes, Your Honor. |
| Q | For the Claimant's - - well, did you find any evidence of any past relevant work? |
| A | No, sir. |
| Q | All right. With respect to the Claimant, I want you to assume that - - well, I want you to assume a hypothetical individual the same age, education, and work experience as the Claimant. That would have the ability to do sedentary work. Wouldn't be able to climb ladders, ropes, or scaffolds. Would be able to occasionally climb ramps and stairs, balancing, stooping, kneeling, crouching, crawling. Wouldn't be able to work in extremes of heat or cold, or dampness or high humidity. Wouldn't be able to work in atmospheres of high amounts of fumes, odor, dust, gases. Wouldn't be able to work at unprotected heights or around dangerous moving machinery. Would there be any full-time, unskilled work such a hypothetical person could do in the local or national economy? And if you'd identify the local economy when you give your answer. |

A    Yes.  May I have just a moment?

Q    Yes.

A    Ready, Your Honor.

Q    Okay.

A    Your Honor, considering the hypothetical you've given me for comment, it would be my testimony that jobs would exist in the national economy, also in the state of West Virginia with that hypothetical person at the sedentary level in the position of a surveillance system monitor operator.  200,000 jobs in the national economy, at least a thousand jobs in the state of West Virginia.  Also at the sedentary level, unskilled, the position of a cashier.  225,000 jobs in the national economy, at least 1,100 in the state of West Virginia.  Also at the sedentary level, unskilled, the position of a taper, electronic assembly.  38,000 jobs in the national economy, and at least 300 in the state of West Virginia.  All the jobs are unskilled, entry-level.  All consistent with the DOT.

BY ADMINISTRATIVE LAW JUDGE:

Q    All right.  Ma'am, in a typical day, let's say - - we'll use a typical workday, say, from 9:00 to 5:00.  Would you tell me - - estimate for me on average the amount of time you spend sitting, standing, walking during that eight-hour period?

A    Well, I go outside, you know.  Walk around, you know.  The I'll go up [inaudible] the field.  Then I'll go back in the house.  I get tired and I sit down about 15, 20 minutes.  And then I get sweating.  I turn the fan on too the same time I put that oxygen back on, you know, before I catch my breath.

Q    Okay.  So then you figure you're standing or walking two hours during that eight-hour time period in total?

A    Yes, sir.

Q    Okay.  And the rest of the time you're basically sitting down, either watching television, or reading, or you know, preparing food, or things of that nature?

A    I just watch television.  Sometimes I watch that soap opera, Days of Our Lives.  Yeah, I think it's about an hour or so, but I don't sit that long.  I move around, you know.

Q    Okay.  I mean, but in total.  When you say you don't sit that long, I mean, can you sit for a half hour at a time?

A    About a half hour.

Q    Now you mentioned you don't have any hobbies.  Do you sew or knit or do craft work?

A    No, no.  My grandma used to try to teach me when I was young, and you know, crochet.  I tried it one time.  I couldn't even do it.

Q    Okay.

A    Yeah, we used to go fishing a long time when the kids was little, but not anymore.

Q    Okay.  I'm going to go back to the vocational witness.  I want you to assume the hypothetical individual the same age, education, and work experience as the Claimant.  But would have the ability to do sedentary work as a previously described to you.  But in addition the individual - - although the individual could

66

stand or walk - - the hypothetical individual could stand or walk the two hours in an eight-hour day, the individual wouldn't be able to stand or walk for more than 15 minutes at a time, and then would have to be able to sit down for a few minutes. And the individual could sit for six hours in an eight-hour workday, but she wouldn't be able to sit for more than - - when you sit down, normally, how long do you sit for? Sit for half hour at a time or - -

A      About a half hour.

BY ADMINISTRATIVE LAW JUDGE:

Q      Normally be able to sit for a half hour at a time. Then would have to be able to get up and move for a few minutes. With those additional limitations would there be any full-time, unskilled jobs such a hypothetical person could do on the local or national economy?

A      Your Honor, the jobs I listed previously all have a sit-stand option associated with them, so that shouldn't be any problem.

Q      All right. Now I want you to assume a hypothetical individual same age, education, and work experience as the Claimant. Who had - - would have the ability to do sedentary work. But due to her impairments would be off task two hours out of an eight-hour workday be cause she would have to be sitting with her feet elevated to the waist level, or otherwise be off task either because of her breathing problems or taking breathing treatments. Would there be any full-time, unskilled jobs such a hypothetical person could do in the local or national economy at the sedentary level?

A      If that would be the case, Your Honor, there would be no jobs. That would remove all the jobs I mentioned as well as any others.

Q      Same question, different limitation. The individual would be absent from work three days a month on an ongoing basis due to her impairments. Would there be any full-time, unskilled jobs such a hypothetical person could do in the local or national economy?

A      No, Your Honor, no jobs.

ALJ    All right. Now the representative, do you have questions?

REPR      No, Your Honor. I believe you covered that.

ALJ      Okay. And I think we have all the medical records that are - -

REPR      Yes, Your Honor.

ALJ    Okay. Then, we're going to take the matter under advisement, ma'am. We'll get you a written Decision. We'll send a copy to your representative.

E.     <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- can speak and understand English (Tr. 182)
- highest grade of school completed-9th grade (Tr. 188)
- Did not attend special education classes (Tr. 188)
- Has not completed any type of special job training, trade or vocational school (Tr. 188)
- Has trouble sleeping at night (Tr. 190)
- Takes naps approx for 5-10 minutes because her back, legs, & knees are hurting (Tr. 190)
- Needs help to take care of her personal needs and grooming (Tr. 191)
- Needs help getting out of the shower & bed in the morning (Tr. 191)
- Husband washes her legs & feet because Claimant can hardly bend over (Tr. 191).
- Prepares sandwiches for breakfast (Tr. 191)
- Can dust furniture around the house (Tr. 191)
- Can shop for food and medication and does so for about 10-25 minutes (Tr. 192)
- Uses public transportation with her son (Tr. 192)
- Reads the newspaper for about 5 minutes everyday (Tr. 192)
- Watches TV for about 20 minutes once a week (Tr. 192)
- Does not have any hobbies (Tr. 193)
- Leaves house once a month for medication & to go to the store (Tr. 193)
- Leaves every 2 months for doctor appointments (Tr. 193)
- Back and hips are where Claimant's pain is located (Tr. 195)
- Suffers from a lot of headaches (Tr. 195)
- has chest pain all day and night (Tr. 198)
- Does not associate with people because Claimant cannot hardly hear very well (Tr. 199)
- Has problems getting along with others (Tr. 199)
- Has problems concentrating (Tr. 199)
- Has trouble finishing tasks, chores and recreational activities (Tr. 199)
- Cannot follow instructions (Tr. 199)

# III. The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant moves the Court to grant Claimant's summary judgment motion due to multiple errors present in the ALJ's decision.   Claimant contends the ALJ "wrongly disregarded the opinion of treating physician Dr. Ghamande" and incorrectly interpreted Dr. Biundo's opinion. See Pl.'s Summ. J. Br., pg. 1-2 (Dkt. 32).  Claimant argues the ALJ's decision ignores significant

portions of the testifying medical expert, Dr. Irwin, because the ALJ fails to address how Claimant's "bad" days would affect Claimant's work capabilities. Lastly, Claimant argues the ALJ's decision is deficient because it provides no explanation for conflicts between the vocational expert testimony and the information in the DOT, but merely states such "reasonable explanations" exist. Id. at 5.

Commissioner contends substantial evidence supports the ALJ's finding that Claimant did not have a disabling impairment prior to June 1, 2007. Specifically, Commissioner argues the ALJ properly evaluated the multiple medical source opinions of Drs. Ghamande, Biundo, and Irwin to conclude Claimant was not disabled prior to June 1, 2007. Additionally, Commissioner contends the ALJ's RFC assessment was "well-supported by objective diagnostic testing and clinical records during the relevant time period." See Def.'s Summ. J. Br., pg. 12 (Dkt. 36). Commissioner moves for a grant of his summary judgment motion because "[t]he medical and non-medical evidence in this case simply failed to establish [Claimant's] impairments were of disabling severity." Id. at 14.

B.     Discussion

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court

is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).

### 1. Whether the ALJ Properly Evaluated the Medical Source Opinions

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist.  20 C.F.R. § 404.1527(d)(2) (2010).  Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).  However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight."  Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 f.2d 1012, 1015 (4th Cir. 1984).

Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and

laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2).  See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).  To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Claimant argues the ALJ incorrectly disregarded the opinion of Dr. Ghamande that Claimant is unable to work because of Claimant's "moderate persistent to severe asthma." See Transcript, Pg. 591.  The ALJ, however, rejected this opinion based on Claimant's own medical records provided by Dr. Ghamande, as well as the other objective medical evidence.  Claimant mistakenly believes the ALJ provided no explanation for giving less than controlling weight to Dr. Ghamande's opinion, however, the ALJ provides a list of contradictory evidence.

In support of his determination of "no disability," the ALJ notes that despite Dr. Ghamande's letter stating Claimant had "moderate persistent to severe asthma," Dr. Ghamande's examination of Claimant on June 15, 2005 resulted in findings that Claimant's lungs were clear and the CT scan of Claimant's chest did not show any significant parenchymal lung disease or evidence of pulmonary embolism. See Transcript, pg. 47.  On July 29, 2005, Dr. Ghamande noted Claimant's lung condition was overall improved with the use of Advair. Id.  On August 23, 2005 Dr. Ghamande reported Claimant's asthma seemed to be reasonably controlled with

prescribed medication. Id.  The ALJ additionally noted Claimant's lungs were clear when examined at her treating physician's office on: July 12, 2005, August 30, 2005, September 22, 2005, September 28, 2005, October 18, 2005, November 8, 2005, November 15, 2005, December 1, 2005, and January 9, 2006. Id.  The ALJ also considered the testimony of the medical expert, Dr. Irwin, in reaching the determination that Claimant was not disabled within the meaning of the regulations.  The ALJ stated "[c]onsidering the above-detailed objective findings related to the [C]laimant's pulmonary problems and the testimony of the medical expert, the undersigned finds that the [C]laimant's pulmonary impairments and any impact on these conditions associated with her obesity have been adequately accommodated by limiting her to the range of sedentary work detailed above...." Id. at 48.  The ALJ found that "the overall record fails to establish a need for continuous use of oxygen." Id. Lastly, the ALJ explicitly considered Dr. Ghamande's letter to the welfare department and, again, found "[t]he overall record, with the numerous reports of normal lung examinations, fails to support the degree of pulmonary limitations opined by the treating source." See Transcript, pg. 49.  The Court finds the ALJ sufficiently considered Dr. Ghamande's opinion and was within his authority to afford less than controlling weight to Dr. Ghamande's opinion.

In addition to affording less than controlling weight to Dr. Ghamande's opinion, Claimant argues the inference drawn by the ALJ from Dr. Biundo's opinion was improper. Specifically, Claimant contends by inferring Dr. Biundo would not have "mentioned weight and deconditioning if Dr. Biundo had found disability" is an "unfounded medical diagnosis." See Pl.'s Summ. J. Mot., pg. 2 (Dkt. 32).  This argument must fail.  The ALJ notes in his determination the reasoning behind the ALJ's decision regarding Dr. Biundo's opinion.  The

ALJ states: "[o]f note, the [C]laimant failed to detail any specific musculoskeletal complaints when seen by Dr. Biundo for the consultative examination...[and] [e]xamination at the time revealed normal range of motion of the back and joints and no neurological deficit." <u>See</u> Transcript, pg. 48.  The ALJ also considers Claimant's other treating physician's to reach a determination.  Specifically, the ALJ outlines the objective findings of Claimant's treating clinic: "although the claimant has been reported to walk with a cane, her former treating physician assistant reported on September 2, 2004, that she had a normal gait and did not need a cane;" "Dr. Ghamanda reported on August 23, 2005, that the [C]laimant's arthritis seemed to be reasonably controlled;" and "[a]lthough the [C]laimant has complained of some right hip pain, an x-ray of the right hip on January 9, 2006, showed no radiographic abnormality." <u>See</u> Transcript, pg. 48.  Additionally, the ALJ cites to Dr. Biundo's report in the ALJ's decision.  The ALJ states "[a] detailed reading of the report submitted by Dr. Biundo fails to establish a basis for the [C]laimant's allegation that he felt she was 100 percent disabled. His primary recommendation was that the [C]laimant lose weight and start a conditioning program, advice[sic] he would not have recommended if he felt she were 100 percent disabled." <u>Id.</u> at 49. Using the objective findings and Claimant's medical records, the ALJ determined that the Claimant had "exaggerated the nature and extent of her impairments present during the period in question." <u>Id.</u> at 49.  While it is true the opinion and credibility of Claimant's treating physician is entitled to great weight, such opinions may be disregarded if there is persuasive contradictory evidence. <u>See</u> <u>Evans v. Heckler</u>, 734 F.2d 1012, 1015 (4th Cir. 1984).  The Court finds the ALJ had sufficient contradictory evidence to afford less than controlling weight to both Drs. Ghamande's and Biundo's opinions.  Accordingly, Claimant's arguments must fail.

Lastly, Claimant argues the ALJ "ignores significant portions of the opinion of the medical expert who testified [Claimant] has 'good' days and 'bad' days." <u>See</u> Pl.'s Summ. J. Mot., pg. 3 (Dkt. 32). The Court finds this argument without merit. The ALJ addresses just that by referencing Dr. Irwin's testimony "that the results of the [C]laimant's pulmonary function studies varied because 'good' and 'bad' days are consistent with the diagnosed asthma." <u>See</u> Transcript, pg. 48. The ALJ continues his analysis of Dr. Irwin's testimony by to reach a determination. For example, the ALJ considered Dr. Irwin's testimony that while "[C]laimant had diminished capacity due to her disease...the pulmonary function studies looked 'pretty good.'" <u>See</u> Transcript, pg. 48. The ALJ also noted Dr. Irwin's testimony that "a 96 percent saturation rate is low normal and that the [C]laimant has had a drop in her level but not a severe drop...[and] that the [C]laimant would not need oxygen at rest but she might occasionally need oxygen after exercising." <u>Id.</u> The Court finds Claimant's argument unpersuasive and, accordingly, it must fail.

## 2. Whether Substantial Evidence Supports the ALJ's RFC Determination In Accordance With the Social Security Regulations

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945 (West 2010). The Residual Functional Capacity assessment is based upon all of the relevant evidence. <u>Id.</u> It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. <u>Id.</u> Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of claimant's limitations may be used. <u>Id.</u> These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a claimant from performing particular work activities.

Id.  The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact.  20 C.F.R. § 416.946.

Ruling 00-4p clarifies the standards for use of vocational experts who provide evidence at hearings before the presiding administrative law judge.  SSR 00-4p, 2000 WL 1898704, at 1 (S.S.A.).  The "ruling emphasizes that before relying on VE . . . evidence to support a disability determination or decision, our adjudicators must: identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles . . . ."  Id.  The ALJ has an affirmative duty to ask about any possible conflict between the VE testimony and the information provided in the DOT.  Id. at 4.  The adjudicator must ask if the evidence provided conflicts with the DOT information and obtain a reasonable explanation for any conflict.  Id.  When there is an apparent conflict, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE's evidence and testimony to support a disability determination.  Id. at 2.

Ruling 00-4p is satisfied "'by the ALJ simply asking the VE if his testimony is consistent with the DOT.'"  Street v. Commissioner of Social Sec., 2010 WL 13476205, at 5 (E.D. Mich. 2010) (citing Martin v. Comm'r of Social Sec., 170 Fed.Appx. 369, 374-75 (6th Cir. 2006)).  If the ALJ asks the VE if a conflict exists and the VE denies, the ALJ's duty ends.  Martin, 170 Fed.Appx. at 374; see also, Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (stating that "SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is 'apparent'.") .  The claimant may bring the VE's mistake to the ALJ's attention, but "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct."  Id.

(finding that "[b]ecause [the claimant] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved.").

The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). Claimant appears to argue the ALJ's RFC assessment and subsequent finding that Claimant could perform jobs that exist in significant numbers in the national economy was also in error. Claimant contends the "same undetailed incorporation of 'the range of sedentary work detailed above'" present in the ALJ's decision still leaves open several questions: 1) what range of sedentary work allows a conclusion of non-disability; 2) what type of sedentary work allows a conclusion of non-disability; 3) testimony of what medical expert allows a conclusion of non-disability; and 4) what are the qualifications of that medical expert, as contrasted against Claimant's treating physician's qualifications, allow this conclusion? See Pl.'s Summ. J. Mot., Pg. 4 (Dkt. 32). The Court addresses each question in turn. First, during the hearing, the ALJ poses the following hypothetical to the vocational expert:

> All right. With respect to the Claimant, I want you to assume that–well, I want you to assume a hypothetical individual the same age, education, and work experience as the Claimant. That would have the ability to do sedentary work. Wouldn't be able to climb ladders, ropes, or scaffolds. Would be able to occasionally climb ramps and stairs, balancing, stooping, kneeling, crouching, crawling. Wouldn't be able to work in extremes of heat or cold, or dampness or high humidity. Wouldn't be able to work in atmospheres of high amounts of fumes, odor, dust, gases. Wouldn't be able to work at unprotected heights or around dangerous moving machinery. Would there be any full-time, unskilled work such a hypothetical person could do in the local or national economy? And if you'd identify the

local economy when you give your answer.

The vocational expert provided the following answer:

> Your honor, considering the hypothetical you've given me for comment, it would be my testimony that jobs would exist in the national economy, also in the state of West Virginia with that hypothetical person at the sedentary level in the position of a surveillance system monitor operator. 200,000 jobs in the national economy, at least a thousand jobs in the state of West Virginia. Also at the sedentary level, unskilled, the position of a cashier. 225,000 jobs in the national economy, at least 1,100 in the state of West Virginia. Also at the sedentary level, unskilled, the position of a taper, electronic assembly. 38,000 jobs in the national economy, and at least 300 in the state of West Virginia. All the jobs are unskilled, entry-level. All consistent with the DOT.

The Court finds this hypothetical to be proper because it contains Claimant's requisite limitations and abilities as determined by Claimant's medical records, objective medical evidence and the physical residual functional capacity examinations. The ALJ additionally posed an alteration on the first hypothetical to the vocational expert by including a sit-stand option to which the vocational expert responded that "the jobs I listed previously all have a sit-stand option associated with them, so that shouldn't be any problem." See Transcript, pg. 821-22. The ALJ provided a third hypothetical which included possible impairments that required an individual to "be off task two hours out of an eight-hour workday because she would have to be sitting with her feet elevated to the waist level, or otherwise be off task either because of her breathing problems." Id. at 822. The vocational expert answered that such limitations, if in existence, would remove all of the previously-mentioned jobs that such a hypothetical person could perform in the local or national economy. The Court finds the ALJ's decision provides a detailed range as well as the type of sedentary work that allowed for a finding of "not disabled" because the decision states Claimant could have performed the positions of: 1) surveillance

system monitor; 2) cashier; and 3) taper, electronics. <u>See</u> Transcript, pg. 51. Additionally, the ALJ met his affirmative duty under Ruling 00-4p. The vocational expert testified that the jobs he listed were consistent with the Dictionary of Occupational Titles ("DOT"). There was no apparent conflict and, therefore, the ALJ was not under a duty to elicit a reasonable explanation for a nonexistent conflict to support a determination of "not disabled." <u>See</u> <u>Terry v. Astrue</u>, 580 F.3d 471, 478 (7th Cir. 2009).

Pertaining to Claimant's third and fourth questions: the testimony and qualifications of what medical expert allows a conclusion of non-disability, the Court finds this to be sufficiently answered in the ALJ's decision. At the hearing, Dr. Irwin was the medical expert who testified. Dr. Irwin was identified at the hearing as such and the ALJ subsequently discussed Dr. Irwin's qualifications, education, and experience which permitted Dr. Irwin to render testimony at Claimant's hearing. It is also notable that the ALJ provided Claimant's representative an opportunity to object to Dr. Irwin serving as the medical witness and Claimant's counsel did not do so. The Court finds any objections to Dr. Irwin serving as the medical expert to be untimely and thus, waived. To the extent Claimant's arguments address the ALJ's RFC findings, the Court finds such arguments unpersuasive. First, the ultimate responsibility for determining a claimant's RFC is reserved for the ALJ alone. 20 C.F.R. §416.946. Second, the Court finds the ALJ's RFC to be well-supported by substantial evidence of objective diagnostic testing and Claimant's own medical records. Accordingly, Claimant's arguments must fail.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because the ALJ

properly evaluated the treating physician's reports and because the RFC determination is left solely for the ALJ.

2.        Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED:<u> December 30, 2010 </u>      <u>/s/ *James E. Seibert* </u>
                                                  JAMES E. SEIBERT
                                                  UNITED STATES MAGISTRATE JUDGE